# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-2880

MOSES BOYD, JR., *et al.*,

*Plaintiffs-Appellants,*

v.

ILLINOIS STATE POLICE, *et al.*,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 98 C 8348—**Joan Humphrey Lefkow**, *Judge.*

———————

ARGUED JANUARY 14, 2004—DECIDED SEPTEMBER 30, 2004

———————

Before FLAUM, *Chief Judge*, and POSNER and WOOD,
*Circuit Judges.*

WOOD, *Circuit Judge.* Plaintiffs are 18 of 51 forensic
scientists (to whom we refer as the Scientists) who worked
for the Chicago Police Department (CPD) crime lab until
July 1996, when they were transferred *en masse* to the
Illinois State Police (ISP). Unhappy with their salaries after
the transfer, the Scientists brought suit under Title VII
alleging that ISP intentionally discriminated against them
in the way that it structured the salary terms for the newly
absorbed group, a majority of which were members of racial
or ethnic minorities. A jury found against the Scientists

shortly after receiving clarifying instructions from the district court. The Scientists then filed a Rule 59 motion for a new trial, which the district court denied.

On appeal, they challenge the jury instructions given by the district court as well as two other rulings. First, they claim that the district court erred in granting summary judgment to ISP on their claim challenging the state's actions under the legislation regulating their transfer from the City's crime lab to ISP's facility. See 20 ILCS 415/12e. The Scientists contended that ISP violated the statute because it failed to consider their years of experience in setting salaries. The district court assumed without deciding that the statute created a private right of action and then concluded that ISP complied with all relevant laws because it did consider the Scientists' years of experience in determining compensation levels. *Boyd, et al. v. Illinois State Police, et al.*, 2001 WL 301150, *7 (N.D. Ill. Mar. 28, 2001).

Second, plaintiff Larry Wilson appeals from the district court's decision to grant judgment as a matter of law to ISP on what Wilson has styled an equal protection retaliation claim. One year after this lawsuit was filed, Wilson came across an e-mail from Teresa Kettlekamp, ISP's Deputy Director of the Division of Forensic Services, stating that Wilson's salary increase should be suspended until further notice because of this litigation. In light of these events, the Scientists amended their complaint to allege that ISP had retaliated against Wilson in violation of Title VII and the equal protection clause. The jury awarded relief under Title VII for Kettlecamp's retaliatory actions. Before the jury began its deliberations, however, the judge granted judgment to ISP as a matter of law on Wilson's equal protection retaliation claim. When the Scientists challenged this ruling in their Rule 59 motion, the district court again sided with ISP.

While we part company with some of the district court's reasoning, we conclude that any errors it made in the

instructions were harmless, and that it correctly concluded that ISP did not violate the transfer statute and did not violate Wilson's rights under the equal protection clause. We therefore affirm.

**I**

In 1994, ISP began taking steps to merge the operations of the CPD's crime lab with those of ISP's crime lab. On July 1, 1996, 51 forensic scientists that had been employed by CPD transferred to the state system. This group consisted of 24 Caucasians, 22 African-Americans, and five Hispanics. Of these, six Caucasians, two African-Americans and one Hispanic were transferred to ISP as supervisors. Prior to the transfer, over 90% of the forensic scientists at ISP were Caucasian and there were no minority supervisors. Given the fact that the CPD lab processed more cases per year than the seven ISP labs combined, it was also true that CPD group was more experienced than their ISP counterparts.

The plaintiff Scientists, 18 of the 51 who were transferred, include seven Caucasians, 10 African-Americans and one Hispanic. They believe that ISP discriminated against them on the basis of race because it paid them less than ISP incumbents with the same formal level of forensic science experience. Although half of the transferring group was Caucasian, the Scientists' theory was that ISP paid them less because the group as a whole was identifiably minority and stood in sharp contrast to ISP's predominately Caucasian workforce.

The evidence at trial showed that ISP set salary levels in consultation with the Illinois Department of Central Management Services (CMS), the state agency authorized to administer the Illinois Personnel Code, 20 ILCS 415/1 *et seq.* CMS follows a standard procedure in hiring new state employees. Each applicant is graded and then placed on an

interview list if he or she meets the stated job requirements. After the interview process, applicants are ranked and given conditional offers pending background investigations, polygraph exams, and drug tests. CMS also uses a standard procedure in setting salaries for new hires. Typically, an applicant is paid up to 10% over her prior salary and is then slotted into the salary step established by a collective bargaining agreement closest to, but not exceeding 10%, over her prior salary. State employees automatically advance one step and receive an additional salary increase on each annual anniversary date of employment. If the applicant is not covered by a collective bargaining agreement, or is being hired into a management position, the 10% rule is applied, but there is no step system. An employee hired under the CMS rules typically does not retain any benefits from a previous job, like sick days or accrued vacation.

ISP worked with CMS to establish a variant of this procedure for the transferring forensic scientists. ISP streamlined the application process and permitted the CPD scientists to carry over their sick days and accrued vacation. In addition, ISP exempted the CPD scientists from the standard six-month probationary period for new state employees. Salaries were set using a two-step process. First, ISP classified each CPD scientist as a Forensic Scientist I, II, or III, based on years of experience. Within these three levels, which were governed by a union contract, were ten steps of increasing salary. Second, ISP looked at the CPD scientist's current compensation, adding on up to a 10% increase, to place the scientist on the closest equivalent salary step. To assure a salary increase, each CPD scientist was then elevated one step.

ISP considered several proposals before settling on this procedure. Mike Sheppo, the bureau chief of the ISP Forensic Sciences Command, and Bruce Vander Kolk, ISP's Commander of the Forensic Science Command, testified

that they persuaded CMS to build in a salary increase for the forensic scientists using the device of the additional step after CMS suggested using its standard procedure. Each of the Scientists received a salary increase of between 1.5% and 11.6% after the transfer. Sheppo and Vander Kolk further testified that ISP never considered paying the CPD scientists the same salary as an ISP incumbent with the same years of experience. Although the authorizing legislation established certain exceptions to the Personnel Code, Sheppo testified that these exceptions did not give ISP the latitude to set salaries without regard to CMS guidelines. At trial, the jury learned that CMS always sets salaries by reference to an employee's prior level of compensation, not by reference to the compensation of an incumbent with equivalent experience. The result of such a rule is that a new hire may draw a larger salary than a more experienced employee if the new hire's prior salary was higher than that of the more experienced employee; conversely, if the new hire's former salary was lower, that person would be paid less than a comparable employee at the state agency. Both Sheppo and Vander Kolk testified to earning less money than people who reported directly to them at various stages of their employment with ISP.

The Scientists, however, thought that ISP had promised to pay them the same salary as incumbents with equivalent experience. They pointed to a meeting in November 1994, during which ISP officials were asked what a CPD employee with 23 years of experience would earn at ISP, assuming a current salary at CPD of $43,000. ISP officials stated that if this person had spent his 23 years of service as an ISP employee, the salary would be $52,000. Sheppo explained at trial that this question posed a hypothetical, and at the time of this meeting ISP had not yet finalized the process for salary determinations. A handout given to CPD employees at the November 1994 meeting explained that salaries would be based on the "number of years of forensic

science experience and where [an employee's] present salary fits into the state's pay range."

After transferring to ISP, the Scientists complained that their salaries were lower than ISP scientists with equal or less experience. In light of these complaints, ISP asked Special Project Coordinator Ron Ewert to investigate the agency's salary structure. Ewert interviewed several of the Scientists and looked at their previous salary levels at CPD. He concluded that although some discrepancies did exist, ISP could not address the discrepancies in a manner that was fair to all employees. Ewert did not recommend that ISP adjust the salaries of the CPD scientists, and no adjustments were made.

The Scientists then filed this lawsuit, alleging that their salaries violated Title VII because ISP intentionally discriminated against them on the basis of race. At trial, they presented the following evidence. First, they told the jury that in addition to the 51 CPD scientists, ISP hired 85 new forensic scientist trainees, a group that was overwhelmingly Caucasian (79 Caucasians, five African-Americans, and one Hispanic). Second, they alleged that Vander Kolk rejected a proposal to allow the forensic scientists to receive seniority credit for their years at CPD because he favored another proposal that "protects our people," referring to ISP's predominately Caucasian employees. Third, they elicited testimony from Robert Chapman, a CPD scientist who is not a plaintiff in this case, about a meeting Chapman had with CPD director Robert Stacey after there had been problems with Chapman's polygraph test. Stacey, who was also being moved to ISP, told Chapman that he wanted the lab at ISP to be "lily white. And realizing what he had said, he changed that to squeaky clean." Chapman claims that Stacey also said that he was going to direct the State Police to investigate people from certain neighborhoods in Chicago. Fourth, the Scientists claimed that Ewert did not take their concerns seriously, telling one of the plaintiffs that he

was not her "ally." The Scientists told the jury that they were "humiliated" to discover that they were paid less than ISP forensic scientists with less experience.

After closing arguments, the parties informed the district court that there was no dispute with respect to the jury instructions. The court reminded the jury "not to single out one instruction alone as stating the law, but must consider the instructions as a whole" in reaching your verdict. It then delivered the following agreed-upon instructions: "Your verdict must be for plaintiffs and against the defendant Illinois State Police on plaintiffs' race discrimination claim if they have proved all of the following elements by the preponderance of the evidence: First, that defendant ISP paid the plaintiffs less than other State Police employees with comparable or less experience. Second, that race was a motivating factor in defendant's salary determinations. If plaintiffs have not proven both of the above elements by a preponderance of the evidence, your verdict must be for defendant, and you need not proceed further in considering this claim." The district court additionally instructed: "As used in these instructions you may find that [ ] plaintiffs's [sic] race was a motivating factor if the racial composition of the plaintiff group played [a] part or a role in the defendant's salary determination to set plaintiffs's [sic] salaries. However, the racial composition of plaintiff group need not have been the only reason for defendant's salary determination." The jury verdict form instructed the jurors to find for the Scientists if they proved by a preponderance of the evidence that ISP "discriminated against them because of race in the determination of their salaries."

During its deliberations, the jury submitted the following note to the court: "We find that the instructions to the jury and the question on the jury verdict form ask us to decide two different things. Do we need [to] decide whether race was "a" factor or "the" factor in determining salaries? If it is *the* factor, does this mean that it is the most important of

multiple factors? And if it is *a* factor, how much of a factor does it have to be?" (emphasis added). Over strong objections from the Scientists' counsel, the judge sent back a note instructing the jury as follows: "To be a motivating factor the forbidden criterion must be a significant reason for the employer's action. It must make such a difference in the outcome of events that it can fairly be characterized as the catalyst which prompted the employer to take the adverse employment action and a factor without which the employer would not have acted." Shortly after receiving the court's response, the jury returned a verdict for ISP on the Title VII race discrimination claim.

In their motion for a new trial, the Scientists argued that the district court erred in giving its clarifying instruction because it misstated the law and undermined the Scientists' closing argument. During closing arguments, the Scientists' attorney told the jury that the instructions directed them to find that "race was a motivating factor" in ISP's decision to pay Scientists less than similarly situated Caucasian employees. On two later occasions in the closing, the Scientists' attorney reiterated that race had to be "a factor, a motivating factor." ISP responded to the Rule 59 motion, arguing that the court's instruction did not misstate the law, that no prejudice was shown, and that the Scientists had failed to present evidence showing that race played any role in the salary determinations. The district court denied the Scientists' motion for a new trial.

## II

We begin by considering the Scientists' claim that the district court's supplemental instruction so gravely misled the jury that a new trial is required. When a party challenges a judge's decision to give a supplemental instruction, we review that decision for an abuse of discretion. *Akrabawi v. Carnes Co.*, 152 F.3d 688, 695 (7th Cir. 1998); *United States*

*v. Mealy*, 851 F.2d 890, 901-02 (7th Cir. 1988). As for the content of the supplemental instruction, the standard of review is the same as that for any instructional issue. It is "a liberal one: we look at jury instructions only to determine if taken as a whole they were sufficient correctly to inform the jury of the applicable law. Even if the instruction contains errors or misguides the jury, the error is reversible only if a litigant is prejudiced." *Molnar v. Booth*, 229 F.3d 593, 602 (7th Cir. 2000) (internal citation omitted).

To win a new trial based on an erroneous jury instruction, the Scientists must show both that the instructions did not adequately state the law and that the error was prejudicial to them because the jury was likely to be confused or misled. *Gile v. United Airlines, Inc.*, 213 F.3d 365, 375 (7th Cir. 2000). An erroneous jury instruction could not prejudice the Scientists unless "considering the instructions as a whole, along with all of the evidence and arguments, the jury was misinformed about the applicable law." *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001).

On appeal, neither party challenges the adequacy of the original instructions given by the court. What is at issue here is the court's supplemental instruction telling the jury that the Scientists' race needed to serve as "the catalyst which prompted the employer to take the adverse employment action, and a factor without which the employer would not have acted." We agree with the Scientists that this was error. The term "catalyst" does not appear anywhere in the text of Title VII and has never been used by the Supreme Court in any of its decisions interpreting Title VII. See also *Gehring v. Case Corp.*, 43 F.3d 340, 343-44 (7th Cir. 1994) (criticizing the district court for using the phrase "determining factor" in jury instructions because such a phrase is not used in the Age Discrimination in Employment Act (ADEA)). It appears that the district court may have borrowed language from *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029,

1033-34 (7th Cir. 1999), in crafting its supplemental instruction, a case considering the phrase "because of disability" under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(a). But the ADA standard may not be the same as Title VII's. We use this opportunity to remind the district courts that jury instructions should not be patched together from snippets of appellate opinions taken out of context, but should rely first on the language of the statute. *Desert Palace v. Costa*, 539 U.S. 90, 98 (2003) (starting with the statutory text of Title VII in evaluating whether the jury instructions at issue were proper); *Akrabawi*, 152 F.3d at 694 (suggesting that district courts "might be better advised" to rely on the statutory language in Title VII in framing jury instructions). Simple instructions are normally the best. See *Gehring*, 43 F.3d at 344.

Title VII makes it unlawful for an employer "to discriminate against any individual . . . , *because of* such individuals's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). In 1991, Congress amended Title VII, adding that "an unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Although the statute does not define "motivating factor," logically there is a difference between a motivating factor, and a single factor that is the precipitating force (one definition of catalyst) for an action. The initial instruction to which the parties agreed correctly stated that "race was a motivating factor if the racial composition of the plaintiff group played a part or a role in the defendant's salary determination to set plaintiffs's [sic] salaries. However, the racial composition of plaintiff group need not have been the only reason for defendant's salary determination." The judge should have referred the jury back to these instructions, which adequately stated the law. *Mealy*, 851 F.2d at 902.

The court's supplemental instructions, which told the jury that race had to be "the catalyst" instead of "a motivating factor" in ISP's salary decisions, were wrong because they placed a heavier burden on the Scientists than Title VII requires. Even so, however, the Scientists can prevail only if the error was prejudicial, and we conclude that it was not. The evidence of discrimination is simply too thin on this record to warrant a new trial, even if proper instructions had been given. *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 722-23 (7th Cir. 2001) (finding that any error in jury instructions would have been harmless "considering the overwhelming evidence" showing no age discrimination against plaintiff); *Gile*, 213 F.3d at 375 (suggesting that incorrect jury instructions resulted in harmless error when it was not clear that the jury would have decided differently on proper instructions); see also *Renz v. Grey Adver., Inc.*, 135 F.3d 217, 224 (2d Cir. 1997) (employer's evidence that it discharged plaintiff because of poor performance "is so strong that a correct charge on the plaintiff's standard of proof in her ADEA claim would not have made a difference to the verdict").

The evidence presented at trial, which we have described already, failed to show that race was ever considered as a factor in setting the Scientists' salaries. ISP worked in consultation with CMS to create a standardized hiring procedure for the CPD scientists. Neither Ewert, who the Scientists believed was unsympathetic to their complaints, nor Stacey, who referred to the ISP crime lab as "lily white," played any role in determining their salaries. Finally, Vander Kolk's reference to "protecting our people," taken in context, simply does not lead to an inference that the Scientists were discriminated against on the basis of race. Vander Kolk was referring to ISP employees as a whole, not Caucasians in particular, when he rejected a particular personnel proposal. The Scientists did not present sufficient evidence to show that race was a factor in ISP's decision to

set salaries, let alone a motivating factor. And since it was not shown to be a factor at all, we have no need to delve into mixed motive analysis. Because the Scientists cannot demonstrate prejudice from the supplemental instructions, they are not entitled to a new trial.

## III

We turn then to the heart of the Scientists' case on the merits: the question whether ISP created a discriminatory system in the way that it integrated the CPD personnel into its own ranks. The Illinois legislature enacted 20 ILCS 415/12e to facilitate the integration of the CPD forensic scientists into the state of Illinois's system. Subsection (a) of the statute provided that the ISP could "enter into an intergovernmental agreement with the City of Chicago with respect to the hiring, classification, compensation, merit and fitness, and conditions of employment of former employees" of the Chicago Police Department lab. *Id.* at 12e(a). Subsection (b) listed some of the provisions such an agreement should encompass, including vacation accrual, sick leave, and background checks. *Id.* at 12e(b)(1)-(6). At issue here is the provision stating: "The employee's period of service as a Chicago Police Department employee shall be considered for purposes of determining the appropriate level of compensation." *Id.* at 12e(b)(3).

As we have explained, ISP used a two-step process to set compensation levels, first categorizing each employee as a Forensic Scientist I, II, or III based on years of forensic science experience, and then moving each employee one step up from their current salary according to state personnel guidelines. The Scientists wanted more, arguing before the district court that ISP's two-step process violated the statute because ISP did not appropriately "consider" a CPD employee's years of service as mandated by Section 12e(b)(3). The district court assumed *arguendo* that the statute created

a private right of action and concluded that ISP did not violate the statute because it had, in fact, considered years of service in setting compensation levels.

When an issue raises a question of statutory interpretation, or the propriety of summary judgment, the standard of review is *de novo. APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 628 (7th Cir. 2002). "Illinois law states that '[w]here clear and unambiguous, statutory language must be enforced as enacted, and a court may not depart from its plain language . . . .'"*Weinberg v. City of Chicago*, 310 F.3d 1029, 1035 (7th Cir. 2002) (quoting *People ex rel. Devine v. $30,700.00 United States Currency*, 766 N.E.2d 1084, 1089 (Ill. 2002)). The plain language of the statute does not explicitly provide for a private right of action, and it is very likely that one cannot be implied under Illinois law. *Metzger v. DaRosa*, 805 N.E. 2d 1165, 1168 (Ill. 2004). In our view, however, the district court's analysis of implied rights was unnecessary to resolve this dispute.

In *Noyola v. Bd. of Educ. of the City of Chicago*, 688 N.E. 2d 81 (Ill. 1997), the Illinois Supreme Court explained that a court should look for an implied right of action only when a plaintiff attempts to use a statutory enactment as the predicate for a tort action. *Id.* at 86. If a plaintiff instead sues to force a public official to comply with the requirements imposed by a statute, as is the case here, the appropriate vehicle is a writ of *mandamus*, provided that the requirements for the writ have been satisfied. *Id.*; *Lewis E. v. Spagnolo*, 710 N.E. 2d 798, 813-14 (Ill. 1999). *Mandamus* is appropriate only when a public officer has failed to perform an official duty that involves no exercise of discretion on the part of the official. *Noyola*, 688 N.E. 2d at 86 (citing *Madden v. Cronson*, 501 N.E. 2d 1267 (Ill. 1986)). A writ will be granted only if the Scientists "can show a clear, affirmative right to relief, a clear duty of the defendant to act, and clear authority in the defendant to comply with the writ." *Lewis*, 710 N.E. 2d at 813 (citations omitted).

The Scientists did not ask for *mandamus* relief, and it is too late now for them to try. Moreover, on this record there is no basis for this extraordinary remedy. The undisputed material facts demonstrate that ISP did "consider" their period of service with the Chicago Police Department in the two-step process establishing compensation levels. The district court correctly found that ISP did not violate Section 12e(b)(3) of the authorizing legislation.

## IV

In 1999, one year after this lawsuit was filed, plaintiff Larry Wilson filled in for a supervisor and reviewed the supervisor's e-mail, as required by the job. At that time Wilson was being considered for a salary increase and his immediate supervisor had recommended an increase. Wilson read an e-mail from Kettlekamp in his supervisor's account stating that any salary increase for Wilson should be suspended until further notice due to this litigation. The Scientists quickly amended their complaint to add two retaliation claims. The first was brought under Title VII and went to the jury. Although Kettlekamp attempted to explain that the e-mail was prompted by discussions with legal counsel, the jury found in Wilson's favor and awarded $25,000 in compensatory damages.

The second claim was titled, "42 U.S.C. §1983—Intentionally Discriminatory Retaliation." Wilson asserted in the complaint that Kettlekamp's actions deprived him of equal protection "as guaranteed by the Fourteenth Amendment by wilfully retaliating against Wilson due to his involvement in the present case." At the close of evidence, ISP moved for judgment as a matter of law on this claim, arguing that Wilson had not shown a difference in relief available under a Title VII and an equal protection retaliation claim. ISP asserts that Seventh Circuit law does not recognize an equal protection retaliation claim on the facts that Wilson has alleged.

The district court initially denied ISP's motion, but later it reconsidered during an off-the-record conference and granted judgment as a matter of law in ISP's favor. The following day, the court denied Wilson's motion to reinstate the equal protection claim. Wilson had argued that it was a logical extension of Seventh Circuit precedent to permit such a claim. When Wilson raised the issue again after trial, the court denied the Rule 59 motion for the "reasons stated on the record." The lower court's reasons, however, are nowhere to be found in the record.

Typically, we will reverse the denial of a Rule 59 motion to alter or amend a judgment only for an abuse of discretion. *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 855 (7th Cir. 2002). That is precisely what the Scientists claim happened here: they assert that the district court, by applying the wrong legal rule, necessarily abused its discretion. *Khan v. Gallitano*, 180 F.3d 829, 837 (7th Cir. 1999). Our review of the district court's interpretation of the law is *de novo. Id.*; see also *Koon v. United States*, 518 U.S. 81, 100 (1996) (if a court applies an erroneous view of the law, "by definition" it abuses its discretion). We may affirm on any ground supported by the record. *Omosegbon v. Wells*, 335 F.3d 668, 677 (7th Cir. 2003). Because this claim presents a straightforward question of law, we need not remand it for the district court to provide its rationale. *Id.*

Wilson claims that Kettlecamp retaliated against him for filing a lawsuit in violation of his rights under the equal protection clause. As ISP correctly points out, the right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the equal protection clause. *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1296 n.8 (7th Cir. 1996) ("We do not imply, however, that retaliation claims arise under the Equal Protection Clause. That clause does not establish a general right to be free from retaliation."); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989) ("Gray's right to be free from retalia-

tion for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause."); *Vukadinovich v. Bartels*, 853 F.2d 1387, 1391-92 (7th Cir. 1988) (plaintiff's equal protection claim alleged "only that he was treated differently because he exercised his right to free speech" and thus was "a mere rewording of plaintiff's First Amendment-retaliation claim"); see *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997); *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996); *Ratliff v. DeKalb County*, 62 F.3d 338, 340-41 (11th Cir. 1995); *Thompson v. City of Starkville*, 901 F.2d 456, 468 (5th Cir. 1990).

*Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412 (7th Cir. 1988) is illustrative. Yatvin claimed that her equal protection rights were violated when her employer retaliated against her for filing charges of sex discrimination. We found this argument weak because "retaliating against a person for filing charges of sex discrimination is not the same as discriminating against a person on grounds of sex . . . ." *Id.* at 418-19. We explained that Congress would not have wanted a Title VII plaintiff to bypass the elaborate "administrative procedures created by the statute (procedures as applicable to retaliation claims as to any other claims under Title VII), and go directly to court, through the illogical expedient of equating discrimination against a person for filing charges of sex discrimination to sex discrimination itself." *Yatvin*, 840 F.2d at 419. Like the plaintiff in *Yatvin*, Wilson has not asserted that Kettlecamp retaliated against him on the basis of a protected trait or because of his membership in a particular class, but only because of his participation in this litigation. This is a harm that he could redress under either Title VII or the First Amendment, but not the equal protection clause. *Gray*, 885 F.2d at 414.

Wilson makes passing reference to *Olech v. Willowbrook*, 160 F.3d 386 (7th Cir. 1998), *aff'd Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) and *Esmail v. Macrane*, 53 F.3d 176 (7th Cir. 1995), which authorize a "class of one" equal

protection claim if the state actor has intentionally treated the plaintiff differently from those similarly situated and no rational basis is offered for the difference in treatment. Wilson has not brought forth facts to sustain a "class of one" claim, and so we reject that approach as well on this record.

Although we do not have the benefit of the district court's rationale, we conclude on our *de novo* review that judgment as a matter of law was properly granted to ISP.

## V

For these reasons, we AFFIRM the judgment of the district court.

POSNER, *Circuit Judge*, concurring in the judgment and the opinion of the court. I agree that we should affirm despite the error in the supplemental instruction. The fact that the jury may have been influenced decisively by that instruction, as suggested by the length of its deliberations before the instruction was given (2 hours) and after (8 minutes), is not important. The case should not have been allowed to go to the jury; no reasonable jury could have found a violation in this case.

My reason for writing separately is to urge district judges to do a better job of presenting the issue of "motivating factor" to a jury than was done in the original instruction, even though that instruction did not misstate the law. It may be unrealistic to think that jury instructions are very important *to the jury*; their principal importance may lie in

placing bounds on what the lawyers can say to the jury in their closing arguments. Still, some pains should be taken to make jury instructions clear. As we said in *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994), in disapproving the use of the term "determining factor" in jury instructions in cases under the age discrimination law, "What the jury needs to know can, and should, be expressed in simple language." Jury instructions should turn the language of statutes and judicial opinions, which is generally not drafted with a lay readership in mind, into language that poses concrete decisions for lay jurors to make. An instruction that uses the term "motivating factor" does not do this.

The original instruction did try to explain the term: "you may find that plaintiffs' race was a 'motivating factor' if the racial composition of the plaintiff group played [a] part or a role in the defendant's salary determinations to set plaintiffs' salaries. However, the racial composition of the plaintiff group need not have been the only reason for defendant's salary determinations." But to say that something plays "a part or a role" in the decision about which the plaintiff is complaining is not illuminating.

To point the way to the drafting of an intelligible instruction, consider the following cases:

1. The plaintiff proves that the defendant is hostile to members of the plaintiff's race (religion, sex, ethnicity, etc.—I'll use "race" to stand for all the forbidden grounds), period.

2. The plaintiff proves that the defendant, because of that hostility, would have fired (or taken other adverse action against) him even if he had been a satisfactory worker in the sense that had he been of the "right" race he would have been retained.

3. The plaintiff proves the same thing as in case 2 but the defendant presents evidence that it would have fired him anyway, regardless of his race, because he was an unsatisfactory employee.

4. The defendant would not have fired the plaintiff for his race alone or for his performance alone; it was some combination of race and performance that caused the firing. His performance was marginal; his race pushed him over the edge. In other words (though not words that would be meaningful to most jurors), race and performance were each necessary conditions of the discharge, but neither was a sufficient condition. In case 2, race is a sufficient condition; in case 3, performance is a sufficient condition.

In case 1, the defendant is entitled to judgment, because to be a "motivating factor" racial hostility has to have some, even if an attenuated, effect; to motivate is to influence, to provide an impetus to action. *Stopka v. Alliance of American Insurers*, 141 F.3d 681, 688 (7th Cir. 1998); *Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1004 (7th Cir. 1994); *Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100, 107-08 (2d Cir. 2001). Plenty of people harbor prejudices of various sorts without acting on them. Title VII does not forbid prejudice as such. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 262 (1989) (concurring opinion).

In case 2, the plaintiff has proved that race *was* a motivating factor. Even if no other factor that might have influenced a decision to fire the plaintiff were present, he would have been fired.

Case 3 is where the 1991 amendment to Title VII that inserted "motivating factor" into the statute bites. 42 U.S.C. § 2000e-2(m); see *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). The amendment entitles the plaintiff to an instruction that the defendant bears the burden of persuading the jury that the fact that the plaintiff was an unsatisfactory employee would have induced the defendant to fire him even if the defendant would have fired him anyway because of his race had he been a satisfactory employee, and thus even if "a discriminatory intent entered into the decision to fire him." *Miller v. Illinois Dept. of Corrections*, 107 F.3d 483, 484-85 (7th Cir. 1997); *Weston-Smith v. Cooley Dickinson*

*Hospital, Inc.*, 282 F.3d 60, 64 (1st Cir. 2002). If the defendant carries this burden, it escapes having to pay damages but, by virtue of the 1991 amendment, still has to pay the plaintiff's attorney's fees and is also subject to declaratory and injunctive relief. 42 U.S.C. § 2000e-5(g)(2)(B); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir. 1998); *Borgo v. Goldin*, 204 F.3d 251, 255 n. 6 (D.C. Cir. 2000).

In an ordinary tort case, and in Title VII cases as well prior to the 1991 amendment, the plaintiff would have had to prove not only a breach of a legal duty by the defendant but also that had it not been for that breach the plaintiff would not have been injured. E.g., *McQuillen v. Wisconsin Educational Ass'n Council*, 830 F.2d 659, 664 (7th Cir. 1987); *Germane v. Heckler*, 804 F.2d 366, 368 (7th Cir. 1986); *Manoharan v. Columbia University College of Physicians & Surgeons*, 842 F.2d 590, 594-95 (2d Cir. 1988). In other words, if the plaintiff would have been injured anyway, he could not recover anything; so, once the defendant produced some evidence of this possibility, the burden of negating it rested on the plaintiff. If, therefore, as in my case 3, the defendant presented evidence that race, while a sufficient condition for the firing of the plaintiff, was not a necessary condition—because he would have been fired anyway, for a reason that would not violate discrimination law—the plaintiff would have the burden of persuading the jury that he would not have been fired had it not been for his race.

In other words, there are two different senses of "cause" in case 3. Racial hostility caused the defendant to fire the plaintiff in the sense that it supplied the impetus to the defendant's action, but in an equally good sense did not cause the plaintiff to lose his job because he would have lost it even if the defendant had not been induced to fire him by racial hostility.

Of course, jurors should not be burdened with terms like "sufficient condition" or "necessary condition" (or for that matter "catalyst") or introduced to the complex meanings of

"cause." They should be told simply that the plaintiff must prove that he would have been fired, because of his race, even if he had been a satisfactory worker (not necessarily a superlative worker, but a worker who would have been retained had he been of a different race), but that if the defendant presents evidence to show that the plaintiff would have been fired anyway, regardless of his race, because he was an unsatisfactory employee, it is the defendant's burden to prove this by a preponderance of the evidence. This is more precise and informative than talk about "motivating factor" and whether something "played a part or a role" in the defendant's action.

The defendant in this case argues that the "motivating factor" amendment is applicable only in a "mixed motive" case, and this was a "pretext" case. The Second and Third Circuits have accepted the argument. *Watson v. Southeastern Pennsylvania Transportation Authority*, 207 F.3d 207, 214-20 (3d Cir. 2000); *Fields v. New York State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 121-24 (2d Cir. 1997); the Supreme Court declined to address it in the *Desert Palace* case. See 539 U.S. at 94 n. 1. Let me try to cut through the jungle of verbiage. If a defendant decides to put on the defense (actually just a partial defense, a defense against damages but not against other relief) that he would have fired the plaintiff anyway, he makes the case a case of mixed motives or, as I would prefer to say (though not to a jury!), because it is a little clearer, a case of dual causes: race, but also performance. He makes it case 3. But if instead he argues that the *only* reason he had for firing the plaintiff was poor performance, this means he is going for broke; he wants a complete defense, not the partial one that is all that the 1991 amendment allows, and he can obtain that absolution only if the jury is convinced that the plaintiff's performance was the only reason for firing him; that race was not in the picture at all. If the jury is not convinced, performance falls out of

the picture, and we are left with a case in which the only factor in the plaintiff's dismissal is race: case 2.

Case 4 may seem the most troublesome. Actually it is perfectly clear that the plaintiff should win it. We can see this by comparing the situation of two employees of the same employer, doing the same job, both equally subpar but one is black and the other white. Under the facts assumed in case 4, the black will be fired but not the white, because his deficiencies are not alone enough to get one fired; one must be of the "wrong" race as well. It is a clear case of racial discrimination with consequences. An employer doesn't have to retain marginal employees, or for that matter superior ones; but he cannot use race to differentiate between those he retains and those he fires. The only difference between this case and case 2 is that if the plaintiff were a better worker, he might have been retained despite the defendant's racial hostility, and so there is a sense in which he contributed to his own downfall. But this, it should be made clear to the jury, has no legal significance.

So: defendant wins 1; plaintiff wins 2 and 4, and 3 goes to the jury with an instruction placing the burden of proving an absence of a causal relation on the defendant.

A true Copy:

      Teste:

                        _____

                        *Clerk of the United States Court of*
                             *Appeals for the Seventh Circuit*