In the
# United States Court of Appeals
## For the Seventh Circuit

No. 20-3127

JOSEPH KUBERSKI,

*Plaintiff-Appellant*

*v.*

REV RECREATION GROUP, INC.

*Defendant-Appellee.*

_____

Appeal from United States District Court for the
Northern District of Indiana, Fort Wayne Division
No. 1:15-cv-00320 — **Holly A. Brady**, *Judge.*

_____

ARGUED APRIL 22, 2021 — DECIDED JULY 21, 2021

_____

Before WOOD, BRENNAN, and ST. EVE, *Circuit Judges.*

WOOD, *Circuit Judge.* Hoping to enjoy life on the road, Joseph Kuberski bought a recreational vehicle manufactured and warranted by REV Recreational Group. Unfortunately, the RV turned out to be a lemon. It did, however, come with a warranty that required REV to repair defects. When the company's authorized dealers were unable to solve

Kuberski's seemingly endless string of problems with his RV, REV arranged a service appointment at its factory shop. His patience at an end, Kuberski skipped the appointment and instead sued REV in federal court, alleging a breach of warranty. A jury returned a verdict for REV.

Kuberski now appeals, arguing that the district court gave an incorrect jury instruction regarding "substantial compliance" under the warranty. But even if Kuberski is correct that the instruction was flawed, he cannot demonstrate prejudice from that error. We thus affirm the jury's verdict.

## I

### A.  The Fleetwood Storm

A 21-year army veteran, Joseph Kuberski began his retirement with plans to travel across the country on the open road with his wife. On March 19, 2013, he purchased a new 2013 Fleetwood Storm 32V for nearly $160,000. The RV's manufacturer was REV Recreational Group, Inc., headquartered in Decatur, Indiana. Kuberski purchased it through one of REV's authorized dealers, Camping World RV Sales, located in North Carolina. The fun was short lived (if it ever existed at all).

During the first year or so after he bought the vehicle, Kuberski reported over 40 defects to Camping World. And these were not trivial problems. For example, the shower head in the bathroom would not completely shut off, a leak had sprung under the bathroom sink, the toilet-flushing mechanism (the "San T") did not work, and the bathroom vanity "detached" from the wall. In the kitchen, the range light above the oven went out, and the external hose that fed propane into the oven range failed to maintain full flow. When

the Kuberskis sat down to eat, the dinette table and bench seat separated from the wall. The exterior was no better. The windshield wipers kept "blowing fuses." The leveling alarm (which monitors a system of jacks used to lift and level the RV when parked) would come on randomly while the vehicle was in motion, subjecting the Kuberskis to an "excruciatingly shrill" noise. At one point, the front dash came "apart" while they were driving through a freezing rainstorm, letting in cold air and rain, and forcing them to "stuff towels in the gaps, which would obstruct the driver's view as the cold wind kept blowing them up."

Kuberski meticulously reported these defects (and many others) to the dealer, Camping World, through letters and phone calls. As required by the warranty, which covered both the dealer and the manufacturer's obligations, Camping World serviced the RV seven times over the next two years. The dealer's efforts were unsuccessful, however, and by April 2015 Kuberski's patience had run out. On April 25 he sent a letter to REV with a list of every defect he had found, all unrepaired problems, and the servicing records from Camping World. The letter ended with an ultimatum: buy back the RV or exchange it for a properly working replacement model.

REV did not accept either option. Instead, it "extended an offer to … repair all coach related issues that are currently present at no charge to [Mr. Kuberski] [if he] were willing to bring [the] coach to [the] facility … in Decatur, Indiana and then pick it up when the repairs are completed." REV later offered to pay Kuberski's expenses of transporting the RV to Indiana, as long as he could pick up the vehicle when the repairs were complete. Initially, Kuberski accepted the offer. The repair was scheduled to begin on August 18, 2015.

But he never showed up at REV's facility. He apparently was nearby: his "final trip" in the RV took him from his home in North Carolina to Illinois in July 2015. But when the transportation company (hired by REV) called him in August to schedule the pickup, Kuberski "advised them not to pick up [the] coach and that [he] had contacted an attorney." REV then called Mr. Kuberski to confirm that he was "rejecting [the] offer of no-charge repairs." Kuberski confirmed and sued REV in federal court three months later.

### B. The Lawsuit and The Warranty

Kuberski chose the district court in the Northern District of Indiana, Fort Wayne Division, which covers Decatur. His primary claim arose under the federal Magnuson-Moss Warranty Act, although he also included state-law theories under both Indiana and North Carolina law. After some procedural wrangling, only the North Carolina breach-of-warranty and the federal Magnuson-Moss theories survived to reach the jury. The Magnuson-Moss Act creates a private right of action for any "consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under [the statute], or under a written warranty, implied warranty, or service contract." 15 U.S.C. § 2310(d)(1). We look to state law—here, North Carolina's—to determine whether the plaintiff has stated a claim for breach of warranty. See *Voelker v. Porsche Cars North America, Inc.*, 353 F.3d 516, 525 (7th Cir. 2003).

Kuberski's RV was covered by a warranty that created bilateral obligations on the parties. The dealer and manufacturer agreed to repair defects, but the buyer was required to provide the dealer and manufacturer with notice and an opportunity to cure the defects:

Written notice of defects must be given to the selling dealer or manufacturer within thirty (30) days of discovery by owner … . The owner shall deliver the motor home to the dealer … for warranty service.

… [T]he manufacturer requires that the owner first provide it with direct written notification of any alleged unrepaired defect, or any other dissatisfaction experienced with the motor home so the manufacturer has the opportunity to cure the problem or dissatisfaction itself. Giving the manufacturer this direct notice and opportunity to cure enables the manufacturer to supplement prior efforts by its authorized dealers so any ongoing problem or dissatisfaction can be resolved or addressed by the manufacturer.

The warranty further provided that "[u]pon receipt of notice of a claim, where the dealer was unable or unwilling to resolve the problem," the manufacturer would "repair or replace any parts necessary to correct defects in material or workmanship."

Kuberski's breach-of-warranty claim proceeded to a jury. Over his objection, the court instructed the jury that Kuberksi had to prove: (1) that he "complied with the terms of the warranty," (2) that the RV had a covered defect, (3) that REV was "given a reasonable opportunity to repair any defect covered by the warranty," and (4) that REV "did not repair or was unable to repair the defect within a reasonable time or after a reasonable number, but not unlimited number, of attempts." The jury returned a verdict for REV on October 2, 2020.

It is possible—maybe likely—that the jury thought that Kuberski did not "comply" with the terms of the warranty

when he failed to tender the vehicle to REV's Indiana facility. At least, that is Kuberski's interpretation of the verdict. Seeking a new trial, Kuberski argues that the district court imposed too high a burden on him. Under North Carolina law, he contends, a breaching party may collect damages under a contract as long as it "*substantially* complies" with its obligations. Under this more flexible standard, he concludes, the record contained sufficient evidence to permit a reasonable jury to rule in his favor. It was error, then, to tell the jury that only literal compliance (which he concededly did not satisfy, because he refused to deliver the RV to the factory) would do.

Kuberski properly preserved this point. He raised his proposed instruction during trial, but the district court believed that substantial compliance has no place in breach of warranty actions. On appeal, we typically review a district court's decisions on jury instructions for abuse of discretion. *United States v. Tavarez*, 626 F.3d 902, 904 (7th Cir. 2010). Nonetheless, when (as here) the case turns on a question of law, our review is *de novo*. *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 835 (7th Cir. 2016).

## II

To win a new trial based on an incorrect jury instruction, an appellant "must show both that (1) the instruction inadequately states [the applicable] law; and (2) the error likely confused or misled the jury causing prejudice to the appellant." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 374–75 (7th Cir. 2000). As we now explain, while Kuberski may be able to meet the first of those hurdles, he cannot satisfy the second. Even if the jury had been instructed on substantial compliance, it would not have "made any difference here." *Id.* at 375.

**A. Legal Error**

The doctrine of substantial compliance allows a breaching party to avoid forfeiting its contractual benefits when it has, for the most part, complied with its obligations. Under North Carolina law, a party seeking to invoke the defense of substantial compliance "must present a case in which there has been no willful omission or departure from the terms of the contract." *Riley v. Carpenter*, 55 S.E. 628, 629 (N.C. 1906). Any "omission must be the result of mistake or inadvertence, and not intentional." *Id*.

While the doctrine "is generally reserved for situations where only minimal work is left to be completed, or the defects or omissions are of such a nature that can be remedied," *Gibson Contractors, Inc. v. Church of God in Christ Jesus of Angier*, 2004 WL 1609332, at *2 (N.C. App. 2004), such as in construction contracts, the doctrine "is not limited in its application" to construction contracts. *Black v. Clark*, 243 S.E.2d 808, 811 (N.C. App. 1978). North Carolina law does not exhaustively tell us what those "other" applications may be, but it does indicate that the doctrine of substantial compliance was "conceived" for situations "where the obligor-plaintiff has given the obligee-defendant a substantial portion of that for which he bargained and the performance is of such a nature that it cannot easily be returned." *Id*.

Nothing in North Carolina law seems to prevent the doctrine of substantial compliance from applying to breach of warranty actions. In the present case, we can infer from the warranty that in exchange for a promise to repair any defects, REV expected that the buyer (Kuberski) would notify it of defects and give it an opportunity to cure. Such a "notice-and-opportunity" regime gives the manufacturer a chance to

make amends with its customer, see what went wrong with its product, learn from its errors, and evaluate how its authorized dealers are performing repairs. If those goals are met, it is conceivable that North Carolina law would forgive minor deviations from the warranty provisions, and thus that substantial compliance would suffice.

But we do not need to decide this issue of North Carolina contract law once and for all. Even assuming that the correct instruction would have conveyed that substantial compliance was enough, Kuberski was not prejudiced by the error.

## B. Prejudice

Even in the face of legal error, "a new trial is appropriate only if the [jury] instruction prejudiced the complaining party." *Lewis v. City of Chicago Police Dept.*, 590 F.3d 427, 433 (7th Cir. 2009). This is true even for "patently incorrect" instructions. *Gile*, 213 F.3d at 375.

When evaluating prejudice, we view the evidence as a whole to determine whether the jury could have reached a different outcome had the instructions been correct. The case of *Boyd v. Illinois State Police* provides a helpful example of an incorrect but harmless jury instruction. 384 F.3d 888 (7th Cir. 2004). There, the district court erroneously instructed the jury that under Title VII, the employee-plaintiffs had to prove that race was "the catalyst" for the alleged employment discrimination. *Id*. at 895. The correct instruction, we held, would have said that the plaintiffs were required only to show that race was "a motivating factor." *Id*. But while this error caused the plaintiffs to carry "a heavier burden" than required, we concluded that even if the jury were instructed on the correct standard, the "evidence of discrimination [was] simply too

thin on this record to warrant a new trial." *Id*. Indeed, the record failed to show that race was ever "a factor at all," and so a new trial was not justified. *Id*. at 896. See also *Crabtree v. National Steel Corp.*, 261 F.3d 715, 722–23 (7th Cir. 2001).

The same outcome is appropriate here. Kuberski's acknowledged failure to honor his appointment with REV in August 2015 was not a simple failure of literal compliance. It was enough also to defeat a finding of substantial compliance. The analogous situation in the North Carolina case of *Lyerly v. Malpass* explains why this is so. 346 S.E.2d 254 (N.C. App. 1986). In *Lyerly*, the defendant agreed to dredge a waterway to connect a neighborhood to a nearby body of water (presumably to enable the residents to park and take out their boats). He dredged 80% of the canal, stopped, and demanded contract payments under the doctrine of substantial compliance. *Id*. at 258. The court held that even though the channel was nearly complete, "its purpose is completely frustrated by the part which remains undredged." *Id*.

So, too, Kuberski's failure to give REV an opportunity to cure defects defeated the warranty's stated purpose. To be sure, Kuberski may have given the dealer, Camping World, ample notice and seven opportunities to cure. And he may have given REV, the manufacturer, more notice than it bargained for. Notice is not in dispute. See, *e.g.*, *Hill v. Winnebago Industries, Inc.*, 2018 WL 5721947, at *1 (M.D. Tenn. 2018) (submitting notice to the wrong department within the company presented a jury question whether plaintiff substantially complied with a warranty's notice requirement). But the point of the provision we quoted earlier was to give REV itself the opportunity to cure the defects, and Kuberski deprived it of that chance. Try as it may, REV cannot inspect the RV through

written correspondence; there is simply no "close enough" when REV could not get its hands on the vehicle at all.

The jury may have viewed matters differently if some force beyond Kuberski's control had prevented him from delivering the vehicle to REV—a road accident, a heart attack, or a tornado. We can safely leave those scenarios for another day. The record is clear that Kuberski's failure to deliver the vehicle to REV was intentional. Only those omissions that are the "result of mistake or inadvertence" can support a substantial compliance defense under North Carolina law. *Riley*, 55 S.E. at 629.

One final point is worth mentioning. As Kuberski puts it in his brief, when he agreed to bring the vehicle to Indiana, he was accepting the "only option to resolve the matter" presented by REV. This is true. But we do not see how this renders REV's offer fundamentally unfair or coercive, particularly when it was consistent with the written warranty and REV had offered to pay the expense of bringing the vehicle to its facility. We do not mean to downplay the headaches that the Kuberskis experienced. But Kuberski needed only to allow the transportation company to pick up the vehicle and then deliver it to REV's facility. At that point, if REV had failed to fix the RV or otherwise make Kuberski whole, he would have been entitled to pursue his breach of warranty claim.

AFFIRMED.