In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2715

HANS J. RAPOLD,

*Plaintiff-Appellant,*

*v.*

BAXTER INTERNATIONAL INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 7369—**William J. Hibbler**, *Judge*

ARGUED JANUARY 12, 2012—DECIDED JANUARY 30, 2013

Before EASTERBROOK, *Chief Judge*, and ROVNER and TINDER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Hans J. Rapold, who is Swiss, sued the pharmaceutical company Baxter International, Incorporated ("Baxter") after it revoked an employment offer for him to work as the Medical Director of Cellular Therapy at its corporate headquarters in Deerfield, Illinois. Dr. Rapold sued Baxter in state court and alleged a number of state law causes of action, but

Baxter removed the case to federal court in reliance on Dr. Rapold's claim under Title VII, 42 U.S.C. §§ 2000e *et seq.* After the district court dismissed the state law claims, Dr. Rapold proceeded to trial on his Title VII claim. The jury returned a verdict for Baxter, and Dr. Rapold appeals. He claims that the district court erred by denying his motion for judgment as a matter of law and by refusing to tender a "mixed-motive" instruction to the jury on the issue of why Baxter revoked his employment offer. We affirm.

## I.

Baxter is a global diversified healthcare company with its world corporate headquarters in Illinois. In 2004, Baxter added "Cellular Therapy" to its already extensive array of businesses aimed at developing, manufacturing, and marketing products for the treatment and cure of diseases. The Cellular Therapy ("CT") business focused on developing new treatments using stem cells—specifically treatments for chronic myocardial ischemia and critical limb ischemia. Andrea Hunt, the Vice President of CT, oversaw the business from its inception and continued in that role at the time of trial. Hunt reported directly to Dr. Hartmut Ehrlich, Vice President of Global Research and Development for Baxter's Bioscience Division, and Ronald Lloyd, Vice President and General Manager of Regenerative Medicine. Hunt's supervisor Dr. Ehrlich is a German national and resided at the time in Vienna, Austria.

As Vice President, Hunt conducted an international search effort to find a CT Medical Director. This

process began in 2004 when the Medical Director at the time, who was a Boston-based physician, declined to relocate to Baxter's corporate headquarters in Deerfield, Illinois. Baxter thus needed a new Medical Director to work with the United States Food and Drug Administration ("FDA") and outside advisory boards (consisting of physicians and "key opinion leaders") in overseeing clinical trials and shepherding new therapies through the FDA-approval process. Baxter's international search for a CT Medical Director took over two years, and ultimately concluded in late 2006 with Dr. Rapold, a Swiss and Belgian national who resided in Germany.

Dr. Rapold holds the United States equivalent of an M.D. and a Ph.D., and also possesses the equivalent of board certification in both cardiology and internal medicine. He worked from 1992 through 1996 for the global pharmaceutical company Roche, where he led the thrombosis research department in conducting worldwide clinical trials. He then worked as a consultant for the American pharmaceutical company Searle, overseeing two international clinical trials. Additionally, Dr. Rapold was the recipient of the prestigious Naegeli Prize (awarded for outstanding contributions to biomedical or clinical research) and authored over 74 peer-reviewed articles.

After interviewing Dr. Rapold twice via video-conference, Hunt sent him an offer letter in December 2006. The letter stated that Dr. Rapold would be an "at will" employee, meaning that Baxter or Dr. Rapold could end the employment relationship "at any time and for any reason." Accepting the CT Medical Director

position necessitated that Dr. Rapold relocate to Deerfield, Illinois, which meant securing a proper visa to enable him to work legally in the United States. Because of ongoing CT clinical trials, Baxter could not afford to wait for Dr. Rapold to obtain his visa before he began working. Thus, Baxter entered into a consulting agreement with Dr. Rapold to enable him to begin work immediately from Europe. The consulting agreement was entered between Dr. Rapold and Baxter Healthcare, S.A., a Baxter affiliate organized under Swiss law. The initial consulting term ran from January 2, 2007 through April 30, 2007. As Medical Director of CT, Dr. Rapold reported directly to Hunt.

Hunt testified that throughout Dr. Rapold's consultancy, she received reports of problematic behavior. Six incidents in particular formed the basis for her ultimate recommendation at the end of May 2007 to withdraw Dr. Rapold's offer of employment. Hunt and other Baxter employees testified about these incidents in detail at trial. Dr. Rapold testified as well, and for the most part simply denied ever having acted inappropriately.

First, several of the individuals assisting Dr. Rapold in obtaining his O-1 visa complained about issues that they had working with him. Baxter sponsored Dr. Rapold in obtaining the visa, which is reserved for temporary workers who possess extraordinary ability or achievement in the sciences or other specified categories. Christine Parro, the Human Resources Director for the CT team, testified that she received multiple complaints

from both Baxter's internal employees assigned to assist with the process and the outside immigration attorney hired to represent Dr. Rapold in obtaining the visa. Parro relayed these complaints to Hunt, who also received some complaints directly. Specifically, a Baxter employee helping Dr. Rapold complained to Hunt that Dr. Rapold's repeated challenges to requests for information rendered him one of the rudest individuals with whom the employee had ever dealt. Similarly, the outside immigration attorney reported difficulty obtaining necessary documentation from Dr. Rapold. He was unable to obtain the requisite three recommendations from Dr. Rapold, who believed the third reference unnecessary on account of his renown and prestige. Because Dr. Rapold failed to provide the third reference, Hunt ultimately obtained an additional reference so that Dr. Rapold could obtain the visa. For his part, Dr. Rapold denied ever having been difficult to work with, although he did acknowledge that Hunt had obtained the third reference on his behalf.

Dr. Rapold also had difficulty from the outset with Baxter's information technology ("IT") personnel. For instance, he was unhappy with the standard Blackberry offered by Baxter because it lacked a Global Positioning System ("GPS") feature. Because Dr. Rapold continued to insist on a Blackberry with GPS, Hunt ultimately enlisted Dr. Norbert Reidel, Baxter's Chief Scientific Officer and a German national, to personally speak with Dr. Rapold and convince him to accept the Blackberry without GPS (which was the only Blackberry Baxter offered its employees). Dr. Rapold also refused to utilize the

speakerphone Hunt repeatedly instructed him to use for weekly meetings at which he participated by phone. Instead, he insisted on using Skype (a software application that allows users to make voice calls over the Internet), which was not supported by Baxter's IT department and repeatedly caused Dr. Rapold's call to be dropped. Despite being told both verbally and in writing by Hunt to use a speakerphone (paid for by Baxter), Dr. Rapold maintained that the speakerphone would not solve the problem, which he attributed to the microphone in Baxter's conference room as opposed to the fact that Skype occasionally cut out during calls. He never did make the switch to a speakerphone.

The third incident informing Hunt's ultimate withdrawal of the offer occurred in February 2007. Because Dr. Rapold could not yet legally work in the United States, Baxter arranged a series of meetings in Toronto, Canada with members of the CT team. Two individuals present during those meetings were Lorna Williams, the CT Director of Research and Design Project Management, and Parro Uppal, CT Senior Marketing Director. According to Dr. Rapold, he believed certain recruitment metrics proposed by Williams and Uppal for clinical trials were unreasonable and "he was trying to bring them in line." In his effort to prevent what he termed "another recruitment blunder" for the trials, he acknowledged at trial that he "might have raised" his voice in order to make his view on the matter known. Uppal, however, recounted that Dr. Rapold became "very angry" about the process Williams proposed and that he was "shouting" and "very agitated" for what seemed like between fifteen and twenty min-

utes. Both Uppal and Williams reported the incident to Hunt, who discussed Dr. Rapold's behavior with him when she saw him at meetings in Vienna, Austria. Specifically, Hunt informed Dr. Rapold that his behavior had been unprofessional and inappropriate. At trial, Dr. Rapold continued to maintain that he had acted professionally at all times, but acknowledged that when Hunt spoke to him in Vienna he assured her that he would refrain from "yelling and screaming" (which he denied having actually done) in the future.

The fourth incident also involved Uppal. She testified that she had edited some slides prepared by Dr. Rapold for submission to an advisory board (composed of outside physicians from across the country to provide guidance in developing clinical trials). After e-mailing the slides back to Dr. Rapold for his review, she spoke with him on the telephone to discuss the changes. Uppal recounted her experience to Hunt, who testified that Uppal informed her that Dr. Rapold had "screamed and yelled at her on changing some slides and hung up the phone on her." Hunt later reviewed the slides and Uppal's modifications, which she characterized as "minor and cosmetic." For his part, Dr. Rapold asserted at trial that he neither yelled nor screamed at Uppal but firmly explained that as a marketing director it "was not among her functions to change the slides of the medical director." Dr. Rapold also denied hanging up on Uppal; instead, he surmised that the call may have been dropped (Uppal was driving in her car when the conversation occurred) and that he must have felt no need to call back since he considered the "topic closed."

Dr. Rapold also had a rocky first meeting in Vienna, Austria with Dr. Ehrlich. At trial, Dr. Rapold explained that in Dr. Ehrlich's presence he and Lloyd had what Dr. Rapold maintained was a professional but somewhat "controversial" conversation. Dr. Rapold also claimed that after the discussion, Dr. Ehrlich expressed support for him by telling him that to be a medical director it was necessary to be "stubborn." He denied recalling whether Dr. Ehrlich had also reminded him that he needed to be a "team player."

The final incident that ultimately prompted Hunt to recommend the withdrawal of Dr. Rapold's offer occurred in May 2007. By this time, Baxter and Dr. Rapold had extended the consulting period beyond its original April 30, 2007 expiry date. Dr. Rapold's O-1 visa was approved at the end of April, and in mid-May, Parro informed Dr. Rapold that his employment in Deerfield would commence on June 4. With Parro's assistance, Dr. Rapold terminated his consulting agreement with Baxter Healthcare, SA. He then traveled to Deerfield in mid-May in order to look for housing.

Prudential International Relocation worked with Baxter executives to find housing and had been retained by Baxter to assist Dr. Rapold with his home search the week of May 13, 2007. Prudential assigned Linda Lincoln, who had worked as a relocation agent for over 20 years, to help Dr. Rapold find housing. Dr. Rapold had looked at properties with Lincoln on a number of occasions and had determined that instead of pur-chasing a home as he had originally intended, he would

look for a short-term rental instead. To that end, Lincoln had located a unit for rent in Lake Point Tower, a luxury condominium building in downtown Chicago. Lincoln testified that she took Dr. Rapold to see the unit after explaining to him that the listing agent and possibly other agents and their clients would be present during the showing. Once Dr. Rapold had seen the unit he approached the listing agent and asked if the price was negotiable and also whether he could have a short-term, three-month rental. Lincoln testified that when the listing agent rejected both of Dr. Rapold's proposals, he became agitated and started shouting at the listing agent, whom he called a stupid American. At trial, Dr. Rapold essentially denied Lincoln's version of events and focused on the fact that the two of them had gone out together several times for drinks and that she had sent him a cordial e-mail after the alleged incident.

Lincoln later e-mailed her supervisor to complain about Dr. Rapold's "abusive and argumentative" behavior and requested that she no longer work with him. Lincoln testified that in her 20-plus years as a relocation agent, she had never before turned back a referral. The following Monday morning, Lincoln's supervisor forwarded her e-mail to Baxter's human resources director for international assignments, who in turn forwarded it to Parro. Parro then forwarded the e-mails to Hunt and the two of them met later that afternoon. The following day, Hunt e-mailed Ehrlich and Lloyd with what she identified as "6+ instances where [Dr. Rapold] has been unreasonable, rude, and abusive to others" along with her recommendation that Baxter withdraw its offer lest

Dr. Rapold's "behaviors . . . blow up potentially with critical folks like the FDA" and key opinion leaders. In her e-mail, she also stated that "[w]orking with Hans has been difficult . . . some of which we attributed to culture and stress in moving." After both Ehrlich and Dr. Reidel approved her recommendation, Hunt called Dr. Rapold and withdrew his offer. Dr. Rapold e-mailed Hunt later that day. In his e-mail, he dismissed Hunt's reasons as "irrelevant" and "ridiculous" and criticized "the American 'consensus culture' (which in too many of the meetings I participated in lead to nowhere else but the next meeting)." He assured Hunt that he would fight her decision to rescind his offer.

In addition to the reference to "culture" in her e-mail to Ehrlich and Lloyd, Hunt referred to Dr. Rapold's culture on several other occasions. Specifically, when Hunt spoke to Dr. Rapold after the incident in Toronto, she told him that it was inappropriate in the United States to dictate his opinion or scream at others in a meeting, behaviors that she suggested may be tolerable in Europe. Hunt also discussed Dr. Rapold's work style with David Amrani, who suggested that Dr. Rapold's behavior may be attributable to a European attitude about working that included a desire not to "stress themselves for a job." She also corresponded via e-mail with Parro about discussing some of Dr. Rapold's behaviors with him and stated that "European cultural differences will need to be addressed." In various other conversations about Dr. Rapold, Hunt referred to his "Germanic" attitude; she also claimed that he had an "autocratic . . . hierarchical way of managing." When explaining these

comments at trial, Hunt averred that it was "well known that businesses in Germany operate in a hierarchical manner." Hunt also once sent an e-mail to Dr. Rapold recapping a previous conversation with him. That e-mail referred to perceptions of Dr. Rapold as "stubborn and difficult to work with" and posited that some of those problems may have been "cultural in nature." Hunt forwarded that e-mail to Parro along with her additional suggestion that they enlist Dr. Riedel (Baxter's Chief Scientific Officer), to provide "a bit of very limited coaching" to Dr. Rapold. Dr. Riedel, who is German, was suggested because he "respects and understands the Germanic approach." Because Baxter withdrew Dr. Rapold's offer shortly thereafter, no "coaching" was ever provided for him.

Before trial and again at the close of the evidence, Dr. Rapold moved to introduce a "mixed-motive" instruction to the jury. Specifically, he proposed instructing the jury that it could find in his favor if his national origin was a "motivating factor" in Baxter's decision to withdraw his offer. The district court rejected the proposed instruction, reasoning that Dr. Rapold's case presented a binary proposition: either he was an excellent employee and Baxter fired him because of his national origin, or his national origin was irrelevant and the defendant fired him because of his bad behavior.

Specifically, the district court noted both pre-trial and at the jury instruction conference that a mixed-motive instruction was inappropriate because by denying any wrongdoing on his part, Dr. Rapold had created a

"simple case" in which the jury could either believe him or the defense, not some combination of the two. Over Dr. Rapold's objection, the court tendered the Seventh Circuit pattern instruction, which states that "plaintiff must prove by a preponderance of the evidence that defendant withdrew his job offer because of his national origin." It continues: "To determine that plaintiff's job offer was withdrawn because of plaintiff's national origin, you must decide that defendant would not have withdrawn its job offer had plaintiff been outside of this protected class but everything else had been the same."

At the close of the evidence, Dr. Rapold also moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure, but the court denied his motion. The jury returned a verdict for Baxter. After trial, Dr. Rapold renewed his motion for judgment as a matter of law under Rule 50(b), but the district court again denied his motion. Dr. Rapold appeals.

## II.

Dr. Rapold argues on appeal that the district court erred by refusing to tender his proffered mixed-motive jury instruction. He also maintains that the evidence at trial established that Baxter withdrew his offer at least in part on account of his national origin, and thus he is entitled to judgment as a matter of law. Because Dr. Rapold's claim that he is entitled to judgment as a matter of law hinges on his belief that the jury instructions were erroneous, we begin with that issue.

We review the district court's refusal to give a jury instruction only for abuse of discretion. *E.g.*, *Consumer Products Research & Design, Inc. v. Jensen*, 572 F.3d 436, 438 (7th Cir. 2009). We consider the instructions as a whole, analyzing them deferentially to determine whether they accurately state the law and do not confuse the jury. *Guzman v. City of Chi.*, 689 F.3d 740, 745 (7th Cir. 2012). The standard of review is "a liberal one: we look at jury instructions only to determine if taken as a whole they were sufficient correctly to inform the jury of the applicable law. Even if the instruction contains errors or misguides the jury, the error is reversible only if a litigant is prejudiced." *Boyd v. Ill. State Police*, 384 F.3d 888, 894 (7th Cir. 2004) (quoting *Molnar v. Booth*, 229 F.3d 593, 602 (7th Cir. 2000) (citation omitted)). Thus, in order to obtain a new trial based on an incorrect jury instruction, Dr. Rapold must establish both that the instructions failed to properly state the law and that he was prejudiced by the error because the jury was likely to be misled or confused. *Id.*

Dr. Rapold maintains that the "but for" instruction given to the jury made it virtually impossible for it to find in his favor because it could not entertain the possibility that *both* his behavior and his national origin informed Baxter's decision to withdraw his offer. He claims the district court's refusal to include his proposed "motivating factor" was inconsistent with the 1991 amendments to the Civil Rights Act recognizing that "an unlawful employment practice is established when the complaining party demonstrates that . . . national origin was *a motivating factor* for any employment

practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003) (explaining that in response to the Court's holdings in certain mixed-motive cases, the 1991 Act set forth standards applicable in such cases).

The Supreme Court has described a "mixed-motives" case as one in which "an employee alleges that he suffered an adverse employment action because of both permissible and impermissible considerations." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 171 (2009) (holding that mixed-motive jury instruction is never proper in an ADEA case). If an employee in a mixed-motive case establishes that national origin, for instance, was a motivating factor for the employment action, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision regardless of the plaintiff's national origin. *Desert Palace*, 539 U.S. at 101. This partial defense bars the plaintiff from recovering damages but allows for declaratory and injunctive relief as well as limited attorney's fees and costs. *See* 42 U.S.C. § 2000e-5(g)(2)(B).

The question of when a mixed-motive instruction is appropriate has engendered considerable confusion. Since the 1991 amendment, courts have developed instructions charging juries that they must find a defendant liable but award no damages if a plaintiff proves that national origin motivated an adverse action but the defendant demonstrates it would have taken the action anyway. *See* Seventh Cir. Pattern Jury Instruction § 3.01

cmts. B & C. Several circuits now provide a mixed-motive instruction in all Title VII cases, *see* 8th Cir. Model Civil Jury Instructions § 5.01; 9th Cir. Model Civil Jury Instructions § 12.1 & cmt.; 11th Cir. Pattern Jury Instructions (Civil Cases) § 1.21 (stating that plaintiff must prove "[race] [sex or gender] was a substantial or motivating factor" that prompted the adverse employment action), but others provide it only when a case presents an issue of mixed motives, *see Watson v. Se. Penn. Transp. Auth.*, 207 F.3d 207, 217-20 (3d Cir. 2000); *Fields v. N.Y. State Office of Mental Retardation & Dev. Disabilities*, 115 F.3d 116, 121-24 (2d Cir. 1997). We have never explicitly adopted one approach over the other, and our pattern instructions continue to retain a distinction between mixed-motive cases and those where a but-for instruction is appropriate. *See* Seventh Cir. Pattern Jury Instruction § 3.01 & cmt. B (noting that other circuits employ "motivating factor" language in all Title VII cases but assuming continued viability of but-for instructions in "non-mixed motive cases in the Seventh Circuit"); *see also Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 438 (7th Cir. 2009) ("This Court has yet to decide when it is appropriate to apply a motivating factor instruction."). Adding to the confusion is the fact that the Second and Third Circuit cases adopting the pretext versus mixed-motive approach both pre-dated *Desert Palace*, which eliminated the need for direct evidence of discrimination (often the stated distinction between so-called "pretext" and mixed-motive cases) in mixed-motive cases. *Desert Palace*, 539 U.S. at 101-02.

In *Boyd*, which dealt with a plaintiff's challenge to a district court's supplemental instruction given to clarify

a mixed-motive instruction, the concurring opinion attempted to explain when a mixed-motive instruction is appropriate. 384 F.3d at 893-94, 899-901.

In the *Boyd* concurrence, Judge Posner identifies four potential scenarios for consideration, one of which is relevant here: a case where the plaintiff proves that the defendant is hostile to members of the plaintiff's race (used as shorthand for all protected classes) but the defendant provides evidence "that it would have fired him anyway, regardless of his race, because he was an unsatisfactory employee." *Id.* at 899. Judge Posner opines that in this scenario—when a defendant presents a partial defense arguing that it would have fired the plaintiff because of poor performance anyway—the plaintiff is entitled to an instruction putting the burden on the defendant to prove that plaintiff's poor performance, and not his ethnicity, motivated the termination (and if it does so the defendant escapes paying damages under the 1991 amendment). *Id.* at 900. In responding to the defendant in *Boyd*'s specific argument that the case was a "pretext" case and not one of mixed motives, Judge Posner explains that if instead the defendant argues that poor performance is the *only* reason it fired plaintiff, then the defendant is "going for broke" with a complete defense. *Id.* at 901. In this scenario the defendant prevails only if it demonstrates that performance was the sole reason for an adverse employment action. *Id.* In its brief, Baxter seizes on this "complete defense" example to support its position that the mixed-motive instruction was inappropriate, given that Dr. Rapold never acknowledged that Baxter's

stated reason for withdrawing his offer was at least partially true.

The district court agreed, and concluded after hearing the evidence that the mixed-motive instruction was inappropriate because Dr. Rapold had for the most part denied any wrongdoing. We are not convinced that whether the plaintiff concedes that a defendant's stated reasons are true (at least in part) is the appropriate test, and we have never held as much. The Fifth Circuit has addressed the question directly, stating that "[r]equiring the plaintiff to concede at trial the legitimacy of the employer's stated reason for the discharge is contrary to the purpose of the mixed-motive framework." *Smith v. Xerox Corp.*, 602 F.3d 320, 333 (5th Cir. 2010). Like the concurrence in *Boyd*, the Fifth Circuit has observed that the mixed-motive theory is probably best viewed as a *defense* for an employer allowing it to counter the plaintiff's evidence that an illegitimate reason was a motivating factor with evidence that it would have taken the same action regardless*. Id.* It goes without saying that if an employee believes he has been discharged for discriminatory reasons, he certainly also believes the employer lacked legitimate nondiscriminatory reasons for the termination. But what of the quoted language from *Gross*, above, to the effect that a mixed-motive case is one in which a plaintiff alleges *both permissible and impermissible* motives by an employer, 557 U.S. at 171; must a plaintiff concede some of a defendant's stated reasons for an adverse employment action to obtain a mixed-motive instruction? Not necessarily. As the *Smith* opinion observed, the mixed-motive framework does not *require*

the plaintiff to concede the legitimacy of an employer's stated reasons—it is the jury's task to decide between two competing theories. *Smith*, 602 F.3d at 333. We agree. The relevant question then is not a plaintiff's concession but whether the case overall is one where either the plaintiff or the defendant's evidence lends itself to co-existing dual causes for an adverse employment action.

The *Boyd* concurrence's focus on the *defendant's* concession or lack thereof, then, is helpful only to a point, since it is the *plaintiff* here who sought the mixed-motive instruction. The Fifth Circuit highlighted the paradox in *Smith* as follows:

> [T]he reality is that the defendant will always prefer a pretext submission that requires the plaintiff to prove that there was no legitimate motivation (but-for) while the plaintiff will always prefer a mixed-motive submission with the burden on the defendant. Illogical or not, that is the law we follow.

*Id.*; *see also Fields*, 115 F.3d at 122 (noting that some defendants prefer not to have a "dual motivation" instruction despite fact that it is an affirmative defense). The parties' positions here lend credence to the *Smith* court's observation. It is important to remember, however, that a case will not always be easily identifiable as one of "pretext" or "mixed-motives" from the outset. For that reason, it is up to the *district court* to decide whether a given case involves mixed motives. And we review this conclusion only for an abuse of discretion.

The district court was within its considerable discretion to conclude that neither Dr. Rapold's nor Baxter's

evidence warranted giving a mixed-motive instruction. Both parties consistently maintained that the evidence pointed to a single cause for Dr. Rapold's termination: according to Dr. Rapold, he was an outstanding employee who was fired only on account of his national origin; according to Baxter, Dr. Rapold was a problematic employee whose repeated bad behavior formed the sole basis for the ultimate withdrawal of his offer. Baxter here clearly sought to present a complete defense: it never argued, as it could have, that Dr. Rapold's national origin may have played a part in its decision but that it would have rescinded his offer regardless of his national origin.

The only remaining question then is whether *Dr. Rapold* presented a case from which the jury could conclude that Baxter had both legitimate and illegitimate reasons for revoking his offer. Dr. Rapold argues essentially that because he presented one reason for his termination (national origin) and Baxter presented another (inappropriate behavior), the district court necessarily should have given the mixed-motive instruction. He buttresses his argument with the language from *Desert Palace* stating that "[i]n order to obtain an instruction under § 2000e-2(m), a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that . . . 'national origin was a motivating factor for any employment practice.'" 539 U.S. at 101 (quoting 42 U.S.C. § 2000e-2). But this language is not as persuasive as Dr. Rapold suggests. First, the Court in *Desert Palace* was answering the specific question whether a plaintiff was required to present direct evidence of discrimination in order to obtain a

mixed-motive instruction. *Id.* at 92. Second, the Court recognized in the course of answering that question that § 107 of the 1991 Act specifies that §§ 2000e-2(m) and 2000e-5(g)(2)(B) set forth standards "*applicable in 'mixed motive' cases*," *Desert Palace*, 539 U.S. at 94 (emphasis added) (quoting Civil Rights Act of 1991, § 107), and specifically declined to decide "when, if ever, § 107 applies outside of the mixed-motive context," *id.* at 94 n.1. Thus, Dr. Rapold's *Desert Palace* quote is limited to establishing the rule for those cases that arise in the "mixed-motive context." The district court concluded that Dr. Rapold's case did not.

Although we do not find this conclusion inescapable, we reiterate that it was not an abuse of discretion. The district court got off track with its seeming insistence that Dr. Rapold concede that his behavior motivated Baxter's decision. Indeed, we think the district court *could have* concluded that Dr. Rapold had presented sufficient evidence that his national origin played some part in Baxter's decision. Baxter would then have had the option to defend with the argument that although national origin played a part in its decision, it would have rescinded Dr. Rapold's offer irrespective of his national origin. But Baxter chose to make a complete defense, denying that Dr. Rapold's national origin played any part in its decision. And Dr. Rapold essentially did the same by insisting that Baxter's stated reasons for rescinding his offer were a pretext for its real reason—his national origin. These positions lent themselves to the district court's conclusion that the mixed-motive instruction was inappropriate. The district

court thus concluded, in the words of the *Boyd* concurrence, that this case was *not* a case of "dual causes"—i.e., national origin, but also performance. *Boyd*, 384 F.3d at 901.

More importantly, we are unpersuaded by Dr. Rapold's claim that he was prejudiced by the denial of the mixed-motive instruction. Our review of the evidence convinces us Dr. Rapold was not entitled to judgment in his favor either with or without the mixed-motive instruction. Taken in context, the repeated references to Dr. Rapold's "culture" by Hunt and others at Baxter evince little more than an attempt to give Dr. Rapold the benefit of the doubt in the face of increasingly unprofessional behavior. Far from painting Dr. Rapold in an unfavorable light on account of his "Germanic" or "autocratic" tendencies, the testimony establishes Hunt's attempt to help Dr. Rapold succeed at Baxter even as she received increasing feedback of unacceptable behavior by him. Given the evidence, Baxter was entitled to maintain its position that Dr. Rapold's national origin was irrelevant to its actual decision to rescind his offer; the starkly different picture Dr. Rapold attempted to paint with his own testimony left little common ground for the jury to conclude that Dr. Rapold may have behaved badly but that Baxter in some way discriminated against him because of his national origin. The district court was therefore within its wide discretion to conclude that the evidence painted an either-or picture that did not lend itself to the mixed-motive instruction. Although our review may have been more straightforward if the *jury* had been allowed to reject the notion that Dr. Rapold's national origin

played any part in the rescinding of his offer, we are confident that had it been given such an option, the result would have been the same. *Cf. Boyd*, 384 F.3d at 895 ("The evidence of discrimination is simply too thin on this record to warrant a new trial, even if proper instructions had been given.").

This conclusion undergirds our rejection of Dr. Rapold's contention that he is entitled to judgment as a matter of law. We review de novo the district court's denial of Dr. Rapold's Rule 50(b) renewed motion for judgment as a matter of law. *May v. Chrysler Group, LLC*, 692 F.3d 734, 742 (7th Cir. 2012); *see also* Fed. R. Civ. P. 50(b) (permitting the court to order a new trial or direct the entry of judgment as a matter of law upon a finding that a reasonable jury lacked legally sufficient evidentiary basis to find for a party). In doing so, we construe all evidence strictly in favor of Baxter, the prevailing party, and ask only whether that evidence provides a reasonable basis for the jury's verdict. *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012). Although we review the entire record, we do not reweigh the evidence, make credibility determinations, or consider evidence favorable to Dr. Rapold that the jury was not required to believe. *Id.*

The jury here had ample evidence from which to conclude that Baxter did not rescind Dr. Rapold's offer of employment on account of his national origin. As detailed above, the jury heard from numerous witnesses about Dr. Rapold's problematic behavior during his consultancy. Individuals from the IT department testi-

fied that he was inflexible and demanding. The attorney who helped secure his visa recalled him as exceptionally difficult to work with. Parro, Uppal, and others reported to Hunt that Dr. Rapold was rude and unprofessional. The Linda Lincoln debacle was simply one more incident of alarming behavior by Dr. Rapold. Taken together, this evidence easily supports the jury's conclusion that Dr. Rapold's behavior alone informed Hunt's ultimate withdrawal of his offer.

Dr. Rapold conflates the issue of whether Baxter ever considered or discussed his national origin with the actual but distinct issue of whether it took an adverse employment action against him *on account of* his national origin. The jury had no obligation to believe Dr. Rapold's assertions that his national origin, and not his behavior, prompted Baxter to withdraw his offer. As detailed above, there is evidence that Hunt and others explained Dr. Rapold's behavior with references to his "Germanic" approach, to his "culture," and other rather stereotypical notions. But when taken in the light most favorable to Baxter, each of these references can be seen as an attempt by Baxter to accommodate actions by Dr. Rapold that Baxter would have otherwise viewed as intolerable. Indeed, Baxter's attempt to arrange "coaching" for Dr. Rapold from Dr. Reidel illustrates that Baxter did not consider Dr. Rapold to possess immutable "Germanic" or "European" attributes that somehow rendered him unfit for the position. When viewed in Baxter's favor, such actions demonstrate a commitment to help Dr. Rapold succeed in spite of a string of missteps.

Dr. Rapold also makes much of the fact that at the end of the consultancy, Baxter paid him a substantial performance bonus. He claims this demonstrates that Baxter was pleased with his work during the consultancy and that it must not have had any issues with his on-the-job behavior. But the payment of the bonus could just as easily demonstrate Baxter's commitment to Dr. Rapold in spite of his behavior: Baxter had invested considerable time and resources in staffing this crucial position and was willing to overlook his problematic behavior right up until the incident with Linda Lincoln, which, taken together with the other incidents, became a deal-breaker for Baxter. Thus, far from proving Baxter was fully satisfied with Dr. Rapold's performance, the payment of the bonus could simply signify that until the very end, Baxter still wanted Dr. Rapold to succeed as Medical Director.

Finally, Dr. Rapold's insistence on the existence of an anti-Germanic or anti-European bias is undercut by the fact that Hunt extended the employment offer to Dr. Rapold and then later withdrew it. Moreover, after withdrawing Dr. Rapold's offer, Baxter filled his position temporarily with a Belgian national and ultimately replaced Dr. Rapold with a German physician. Although we have rejected the notion that a common actor hiring and later firing an employee creates a *presumption* of nondiscrimination, it is certainly one more piece of evidence for the jury to consider. *See Blasdel v. Nw. Univ.*, 687 F.3d 813, 820 (7th Cir. 2012) ("When the same person hires and later fires the employee who claims that his firing was discriminatory, judges are

skeptical, because why would someone who disliked whites, or Germans, or members of some other group to be working for him have hired such a person in the first place?"). Certainly Hunt's hiring of Dr. Rapold followed by her decision to hire two additional individuals from Europe in his stead would allow the jury to infer that Hunt did not generally harbor animus towards Swiss, German, or European individuals. This conclusion further buttresses our view that the only *reasonable* inference to draw from the evidence is that Dr. Rapold's national origin came into play only in a way that would support the jury's conclusion that Hunt and others were testifying truthfully when they said that Dr. Rapold's nationality was not a factor in the ultimate withdrawal of Baxter's employment offer.

## III.

For the foregoing reasons, we AFFIRM the judgment of the district court.