In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3416

EARL SIDNEY DAVIS,

*Plaintiff-Appellee,*

*v.*

SETH C. WESSEL and GEORGE LAY,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Central District of Illinois, Springfield Division.
No. 3:09-cv-03336-SEM-BGC — **Sue E. Myerscough**, *Judge.*

ARGUED OCTOBER 3, 2014 — DECIDED JULY 7, 2015

Before POSNER, ROVNER, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Earl Sidney Davis, a civil detainee, sued security guards Seth Wessel and George Lay pursuant to the substantive component of the Fourteenth Amendment's Due Process Clause and 42 U.S.C. § 1983, alleging Wessel and Lay refused to remove Davis's hand restraints

while he used the restroom and then laughed as he struggled to unzip his pants and urinate. A jury found in favor of Davis and awarded him $1,000 in compensatory damages. Wessel and Lay appeal, contending that the district court erred in instructing the jury and denying their motion for judgment as a matter of law. We vacate the judgment and remand for a new trial.

## I.     BACKGROUND

Davis is a civil detainee pursuant to the Sexually Violent Persons Commitment Act ("SVP Act"), 725 ILCS 207/1–207/99, in the custody of the Illinois Department of Human Services, and housed at its high-security Rushville Treatment and Detention Facility ("Facility"). The SVP Act permits a person who has been convicted of a sexually violent offense to be civilly detained beyond his criminal sentence, possibly indefinitely but subject to periodic review, if he is found to be "dangerous" because he "suffers from a mental disorder that makes it substantially probable that [he] will engage in acts of sexual violence" in the future. 725 ILCS 207/5(f), 9, 40, 55. Wessel and Lay worked at the Facility as Security Therapy Aids, i.e., security guards.

Davis, then proceeding pro se, filed a complaint in district court under § 1983, alleging (as relevant here) that Wessel and Lay refused to remove his "black box" hand restraints while he used a restroom in a Madison County, Illinois courthouse, and watched and laughed as he struggled to unzip his pants, urinate, and zip his pants, which caused him psychological pain and physical pain in his wrists. After the district court denied Wessel and Lay's motion for summary judgment, the case proceeded to jury trial, with two law students representing Davis. (The law students, Daniel

Campbell and Adam Hearn of the University of Illinois College of Law Federal Civil Rights Clinic, were provisionally admitted to practice as attorneys for the purposes of this case pursuant to Central District of Illinois Local Rule 83.5(A).)

The jury heard evidence that, on May 22, 2008, Davis, then 65-years-old and measuring 5'6'' in height, appeared in the courtroom of Madison County Judge James Hackett. Davis was secured with leg shackles, a wrist chain, handcuffs, and a black-box restraint. A black-box restraint fits over the chain between handcuffs and a portion of the cuffs themselves, largely immobilizing the hands in front of the body approximately two inches apart. A photo of handcuffs fitted with a black-box restraint is below.



Wessel and Lay were the security guards assigned to transport and guard Davis during his courthouse excursion. (A third guard who assisted in transporting Davis is omitted from this discussion because he is not relevant to the appeal.)

Davis testified as follows. During his hearing, Davis asked Judge Hackett if he could use the restroom without

wearing the handcuffs and black-box restraint. Judge Hackett in turn asked Wessel and Lay "if they had a problem with that and they said no." After the hearing, Wessel and Lay escorted Davis to a restroom in a non-public corridor behind the courtroom, which Davis had used more than 15 times before. The restroom, which was 8'x5', had a sink with a metal toilet attached to it, a trash can, a small ceiling vent, and no windows.

Once they arrived at the restroom, Wessel and Lay did not remove Davis's hand restraints. Davis asked "them if they were going to take [the hand restraints] off and they said no." Davis told them that he had a written order from Judge Hackett in his legal folder in their possession stating that "all restraints" were to be removed when he used the restroom at the courthouse. Davis told them that he only wanted the hand restraints removed "so [he] can use the bathroom." Wessel and Lay "refused to look at [his] legal material" and "said they didn't care." With the restraints in place, Davis struggled to unzip his pants, urinate, and zip his pants while Wessel and Lay held the door open, watched, and laughed. Davis got urine "all over" his pants and fingers, and he could not reach the sink to wash his hands. Using the restroom while wearing the handcuffs caused pain in Davis's wrists, and he felt "[h]umiliated" and "degraded." Davis had to defecate as well, but because he was in restraints, he had "no choice" but "to hold it" until he returned to the Facility over three hours later, which hurt his stomach.

Davis identified a February 13, 2001 order from Judge Hackett as the written order he referenced to Wessel and Lay. The order states in its entirety: "Shackles shall be re-

moved [at] courthouse in order to allow [Davis] to utilize restroom (handcuffs, too)." The attorney representing Davis in the proceedings before Judge Hackett testified that he understood this to be a standing order. The parties stipulated to the following facts based upon the district judge's conversation with Judge Hackett during a trial recess: Judge Hackett had no specific recollection of any occurrences on May 22, 2008 (over four years earlier); he sometimes allowed detainees to use the restroom behind his second-floor courtroom; he recalled that Davis had a problem with his wrists, and he usually ordered a detainee's restraints removed while they were in his courtroom; he usually did not enter standing orders, but had done so before; and he usually left security matters to security personnel.

Wessel and Lay both testified that they did not specifically recall the events of May 22, 2008, although they stipulated that they did not remove Davis's hand restraints while he used a restroom at the courthouse. Both testified that they "always" took detainees to use the restroom on the first floor of the courthouse, rather than the one behind the second-floor courtroom. Both recognized that Facility directives permitted them to remove restraints "[w]ithin a secure facility in order to utilize the restroom" and "[p]er orders of the presiding judge while the [detainee] is in the courtroom." Both testified that the courthouse restrooms were not within a "secure facility."

Lay testified that when he is outside the Facility he "leave[s] all [detainees] in restraints, no matter who they are." Wessel similarly testified that if a detainee "requested that [Wessel] remove [the] hand restraints so that [the detainee] could use the restroom," his "answer would be no"

because of "security protocol." Wessel testified that he had observed detainees urinate while wearing black-box restraints, and he believed detainees had defecated while wearing them as well. Wessel said that his practice is not to hold the door wide open while a detainee uses the restroom, but instead to leave the door "cracked" open so he can have an "eye on their presence in the room and their movement." Wessel denied ever laughing at a detainee using the restroom or ever witnessing any other guard laughing at a detainee using the restroom.

The district judge instructed the jury that "[t]o succeed on his due process claims against Defendants Lay or Wessel," Davis had the burden of proving that the defendant under consideration "subjected [Davis] to bodily restraint which was not rationally related to legitimate security purposes, or was excessive in relation to those purposes, or was done in a manner which amounted to harassment for the purpose of humiliating and inflicting psychological pain on [Davis] for no legitimate reason." Wessel and Lay had objected to this instruction and instead proposed a liability instruction stating that Davis had to prove that they "maliciously and sadistically" refused to remove the restraints. The judge also declined to give an instruction proposed by Wessel and Lay that stated: "You have heard evidence about whether the conduct of one or more defendants may have violated a court order. You may consider this evidence in your deliberations. But remember that the issue is whether the defendants used excessive force against the plaintiff, not whether a court order might have been violated."

The jury returned a verdict in favor of Davis as to his "claim of unconstitutional restraints," awarding Davis

$1,000 in compensatory damages and no punitive damages. Wessel and Lay appealed after the district court denied their motion for judgment as a matter of law or new trial.

## II.　DISCUSSION

Wessel and Lay press three arguments on appeal. First, they contend that the district court committed prejudicial error by failing to instruct the jury that the standard for liability requires a showing of intent. Next, they contend that the district court committed prejudicial error by declining to give their proposed "court order" instruction, quoted above. Finally, they contend that the district court erred in denying their motion for judgment as a matter of law.

### A.　Elements Instruction

"We review jury instructions as a whole, 'analyzing them deferentially to determine whether they accurately state the law and do not confuse the jury.'" *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 732–33 (7th Cir. 2013) (quoting *Rapold v. Baxter Int'l Inc.*, 718 F.3d 602, 609 (7th Cir. 2013)), *cert. denied*, 135 S. Ct. 92 (2014). "[I]n order to obtain a new trial based on an incorrect jury instruction, [an appellant] must establish both that the instructions failed to properly state the law and that he was prejudiced by the error because the jury was likely to be misled or confused." *Rapold*, 718 F.3d at 609.

Wessel and Lay argue that they are entitled to a new trial because the district court erroneously instructed the jury on the elements necessary for Davis to prevail, and this error caused them prejudice. They contend that the court's instructions allowed the jury to hold them liable without any finding of intent. Before the district court, they primarily ad-

vocated for the intent standard governing Eighth Amend-
ment claims, and they proposed jury instructions stating that
liability depended on the jury finding that Wessel and Lay
acted "maliciously and sadistically" to harm Davis. *Cf. Hud-
son v. McMillian*, 503 U.S. 1, 6–7 (1992) ("[W]henever prison
officials stand accused of using excessive physical force in
violation of the [Eighth Amendment's] Cruel and Unusual
Punishments Clause, the core judicial inquiry is … whether
force was applied in a good-faith effort to maintain or re-
store discipline, or maliciously and sadistically to cause
harm."). Davis objected to their proposed instructions on the
basis that such intent was not required to prove his claims,
and the district court agreed with Davis.

Before turning to the district court's elements instruction,
we must identify the nature of Davis's claims against Wessel
and Lay, and the legal standard governing those claims.
While the parties agree that Davis, as a civil detainee, pur-
sued claims pursuant to the Due Process Clause of the Four-
teenth Amendment, they dispute the precise nature of the
claims. Davis characterizes his claims against Wessel and
Lay as being for "excessive use of restraints," as recognized
in *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982) (discussing
"the rights of the involuntarily committed to … freedom
from unreasonable restraints"), and *May v. Sheahan*, 226 F.3d
876, 884 (7th Cir. 2000) (referring to a plaintiff's "freedom
from bodily restraint claim," and stating that "[t]he Due Pro-
cess Clause of the Fourteenth Amendment prohibits the use
of bodily restraints in a manner that serves to punish a pre-
trial detainee"). Wessel and Lay, meanwhile, argue stead-
fastly that Davis's claims against them allege excessive force,
and not unlawful conditions of confinement (or its subspe-
cies, excessive use of restraints). They assert that, "[a]s mas-

ter of his complaint, Davis may have been able to frame his claims against Wessel and Lay as either involving his conditions of confinement or excessive force (or both)," but Davis chose excessive force, and he should now be bound by that choice.

As relevant to the claims against Wessel and Lay, Davis's pro se complaint simply recounted factual allegations and cited only § 1983 as legal authority. In opposition to defendants' motions for summary judgment, Davis, still proceeding pro se, referred to his claims as challenging "unconstitutional conditions of confinement," and argued that "the proper standards for evaluating [his] claims are articulated in *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982)…." However, elsewhere in the summary-judgment opposition, Davis refers to claims for "excessive force," and it is unclear whether he is referring to his claims against all defendants (including Wessel and Lay) or just the defendants who are not part of this appeal (the claims against the other defendants unquestionably allege excessive force). The district court's orders denying Wessel and Lay's two motions for summary judgment refer to Davis's claim against Wessel and Lay as the "restroom claim" which challenges "conditions of confinement," and the district court relied upon *May* in denying the motions. In the final pretrial order, jointly submitted by all defendants and Davis (now represented by law students), one of the contested issues of law is listed as "[w]hether Defendants Wessel and Lay used excessive force when they required Plaintiff to remain in 'black box' restraints while using the restroom on May 22, 2008."

However, any confusion occasioned by the reference to "excessive force" in the final pretrial order should have been

dispelled by the district court's jury instructions, including the preliminary instructions. In those instructions, the judge consistently referred to Davis's claims against Wessel and Lay as Davis's "due process claims against Defendants Lay and Wessel." In the final instructions, the judge first set forth the elements of Davis's "claim of excessive force" against the defendants who are not part of this appeal, and then a separate instruction stated the elements of Davis's "due process claims against Defendants Lay and Wessel." The verdict form consisted of three pages—two pages addressing Davis's claims for excessive force against the other defendants, and a separate page addressing Davis's "claim of unconstitutional restraints against Defendants George Lay and Seth Wessel." We think it should have been adequately clear to Wessel and Lay at trial that they were defending against due process claims of "freedom from unreasonable restraints," as recognized by *Youngberg*, 457 U.S. at 321.

Now we turn to the appropriate legal standard governing Davis's claims against Wessel and Lay. The standard finds its origin in *Bell v. Wolfish*, 441 U.S. 520 (1979), wherein the Supreme Court said that the proper question to guide determination of the legality of conditions of confinement in pretrial detention pursuant to the Due Process Clause is "whether those conditions amount to punishment of the detainee." *Id.* at 535. (Although *Bell* involved a claim by a pretrial detainee rather than a civilly committed plaintiff such as Davis, the difference is immaterial for our purposes. *See Youngberg*, 457 U.S. at 321 (applying *Bell* to a claim by a civilly committed plaintiff); *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003) (same; plaintiffs detained pursuant to the SVP Act).) The *Bell* Court "explained that such 'punishment' can consist of actions taken with an 'expressed intent to pun-

ish.'" *Kingsley v. Hendrickson*, --- S. Ct. ----, 2015 WL 2473447, at *6 (U.S. June 22, 2015) (quoting *Bell*, 441 U.S. at 538). "[T]he *Bell* Court went on to explain that, in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Id*. (quoting *Bell*, 441 U.S. at 561). The "freedom from unreasonable restraints" cases, *Youngberg* and *May*, rely upon this standard. *See Youngberg*, 457 U.S. at 320; *May*, 226 F.3d at 884 ("The Due Process Clause of the Fourteenth Amendment prohibits the use of bodily restraints in a manner that serves to punish a pre-trial detainee. The use of bodily restraints constitutes punishment in the constitutional sense if their use is not rationally related to a legitimate nonpunitive government purpose or they appear excessive in relation to the purpose they allegedly serve.") (citing, *inter alia*, *Youngberg*, 457 U.S. at 316; *Bell*, 441 U.S. at 535–37).

We next turn to the elements instruction given by the district court, which states: "Plaintiff has the burden of proving that the Defendant under consideration subjected Plaintiff to bodily restraint which was [1] not rationally related to legitimate security purposes, *or* [2] was excessive in relation to those purposes, *or* [3] was done in a manner which amounted to harassment for the purpose of humiliating and inflicting psychological pain on Plaintiff for no legitimate reason." (emphasis and numbers added). By using the disjunctive "or," the instruction permitted the jury to hold Wessel and Lay liable on any one of three grounds. The first two grounds closely track the language in *Bell* applicable when liability attached in the "absence of an expressed intent to punish." *Kingsley*, 2015 WL 2473447, at *6. The third ground

allows the jury to find liability if they were to find that Wessel or Lay had an "expressed intent to punish." *Bell*, 441 U.S. at 538. It could be argued that the third ground requires something more than simply an "intent to punish," but we need not concern ourselves with this point since any error in this regard would have *favored* Wessel and Lay—and, not surprisingly, Wessel and Lay mount no challenge to the third ground in their appellate briefing. Therefore, we will focus on the first two grounds of the elements instruction, which Wessel and Lay *do* challenge.

The first two grounds, as we have said, represent avenues by which a plaintiff such as Davis may hold a defendant liable when the defendant has no expressed intent to punish. But this does not mean that Davis had no burden to prove any intent whatsoever. A plaintiff such as Davis must prove that the defendant "possess[ed] a purposeful, a knowing, or possibly a reckless state of mind" with respect to the defendant's actions (or inaction) toward the plaintiff. *Kingsley*, 2015 WL 2473447, at *5. (There was great debate between the parties as to whether *Kingsley*—which originated from our circuit—controls in this case. Although *Kingsley* was an *excessive force* due process case, unlike Davis's case, its discussion is instructive to our due process analysis.) Stated differently, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *see Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property"). Consequently, the Supreme Court has "rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to

those traditionally imposed by state tort law." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992). Instead, the Court has repeatedly "spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis*, 523 U.S. at 846 (collecting cases). Similarly, we have stated that, "[i]f the act involves the gratuitous infliction of pain or suffering it is deemed to be punishment, and *as long as the act was intended* it is a violation of the prisoner's constitutional right even if the act was not intended as punishment." *Hart v. Sheahan*, 396 F.3d 887, 892 (7th Cir. 2005) (emphasis added); *see Slade v. Bd. of Sch. Dirs. of City of Milwaukee*, 702 F.3d 1027, 1033 (7th Cir. 2012) ("Shouldn't it be enough to say that it violates the due process clause for a government employee acting within the scope of his employment to commit a reckless act that by gratuitously endangering a person results in an injury to that person?"). For instance, "if an officer's Taser goes off by accident or if an officer unintentionally trips and falls on a detainee, causing him harm, the pretrial detainee cannot prevail on an excessive force claim." *Kingsley*, 2015 WL 2473447, at *5.

In Davis's case, if the jury believed that the guards simply did not consider the issue of whether to remove Davis's hand restraints before he used the restroom, then the guards cannot be liable under the Due Process Clause. For example, the jury may have disbelieved Davis's uncorroborated testimony that he requested that the restraints be removed while he was in the courtroom and just prior to using the restroom. Or the jury may have believed the guards' testimony indicating that they would never laugh at a detainee using the restroom and they thought a detainee such as Davis could successfully navigate the restroom process with the restraints attached. In either case, the jury may have nonetheless

awarded compensatory damages based upon the district court's instruction because they thought making a relatively old, frail, and diminutive detainee such as Davis use the restroom in hand restraints "was excessive in relation to [legitimate security] purposes." Indeed, this scenario would explain the jury's decision to award a relatively small amount of compensatory damages while declining to award any punitive damages; the latter decision indicates that the jury did not find that either guard's conduct was, in the words of the punitive damages instruction, "malicious or in reckless disregard of Plaintiff's rights." In short, the jury may well have found Wessel and Lay liable for being negligent or making an accidental mistake, and that is constitutionally insufficient. *See, e.g.*, *Lewis*, 523 U.S. at 849.

We find that the district court's elements instruction failed to properly state the law. No other instruction clarified the issue or otherwise rectified the error. And as we have discussed, Wessel and Lay were prejudiced because the jury was likely to have been misled or confused. A new trial is required. *See Cotts v. Osafo*, 692 F.3d 564, 570 (7th Cir. 2012) (holding that erroneous and confusing instruction which went to the elements of plaintiff's claim prejudiced defendant and necessitated a new trial).

In an effort to salvage the verdict, Davis argues that Wessel and Lay have failed to preserve any argument regarding any intent standard other than the Eighth Amendment's "malicious and sadistic" standard. Federal Rule of Civil Procedure 51 provides that any party wishing to contest a jury instruction must distinctly state "the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). "The objection must be specific enough that the nature of the error

is brought into focus. … There are no formal requirements, but pragmatically speaking the district court must be made aware of the error prior to instructing the jury, so that the judge can fix the problem before the case goes to the jury." *Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 729–30 (7th Cir. 2002) (citation omitted). "Consistency is required as well; to preserve the objection, the party must state the same grounds when objecting to the jury instruction as it does in its motion for a new trial or on appeal." *Id.* at 730. Throughout the case (including on appeal), Wessel and Lay argued that the Eighth Amendment's "malicious and sadistic" intent standard should apply. However, they also argued to the district court during the instructions conference, "in any event, both the Seventh Circuit and U.S. Supreme Court ha[ve] consistently required *mens rea* of some sort." In their motion for new trial, they said the district court's instructions "allowed the jury to return a verdict for Plaintiff without a finding of *mens rea*." In both instances, they called the district court's attention to the Supreme Court's decision in *Lewis*. It is clear that Wessel and Lay consistently advocated for *some* level of intent to be shown, which is the same argument raised on appeal. We find that Wessel and Lay adequately preserved their objections regarding the lack of any intent requirement in the district court's jury instructions.

### B. Rejected Instruction

Wessel and Lay contend that the district court abused its discretion by refusing to give their proposed instruction which stated: "You have heard evidence about whether the conduct of one or more defendants may have violated a court order. You may consider this evidence in your deliberations. But remember that the issue is whether the defend-

ants used excessive force against the plaintiff, not whether a court order might have been violated." Wessel and Lay contend that they were prejudiced by the district court's refusal because there was trial testimony that Wessel and Lay violated a standing order by the state court judge and an oral statement by the same judge that the restraints were to be removed when Davis used the restroom in the courthouse.

The district court said that it rejected the proposed instruction because the use of the term "excessive force" was confusing in the context of the bodily restraint claim raised by Davis, and the proposed instruction was unnecessary because the court's instructions set forth the legal standard. The district court stated that "[a]dmission of the court order was relevant to whether the security reasons given by Defendants for not removing the restraints were legitimate or pretextual. The jury was not confused that the court order automatically meant that the restraints were excessive."

Because we have determined that we must remand for a new trial based upon the elements instruction, we will not dwell on Wessel and Lay's contention regarding the rejected "court order" instruction. We note, however, that the proposed instruction was flawed; as the district court observed, it confusingly referred to Davis's claims against them as being for "excessive force." However, a modified version of the instruction would have placed the evidence of Judge Hackett's purported standing order in proper context. The district judge gave a similar instruction that helpfully placed the evidence of the Facility directives in the proper context. Ultimately, whether such an instruction would be appropriate in a retrial will depend upon the evidence and argument presented at that retrial.

**C. Motion for Judgment as a Matter of Law**

Finally, Wessel and Law argue that a retrial should not be necessary, because the district court erred in denying their motion for judgment as a matter of law. Our review of this issue is de novo. *Venson v. Altamirano*, 749 F.3d 641, 646 (7th Cir. 2014). We "examine the evidence presented, combined with any reasonably drawn inferences, and determine whether that evidence sufficiently supports the verdict when viewed in the light most favorable to the non-moving party." *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013). "[W]e do not make credibility determinations or weigh the evidence. Instead, we reverse the verdict only if no rational jury could have found for the prevailing party." *Id*. (quotation and citation omitted).

Wessel and Lay contend that they are entitled to judgment as a matter of law on the basis of qualified immunity. The doctrine of qualified immunity provides that "[p]ublic officials are immune from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *City & Cnty. of San Francisco v. Sheehan*, --- U.S. ----, 135 S. Ct. 1765, 1774 (2015) (quotation omitted). "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *Id*. (quotations omitted). "This exacting standard gives government officials breathing room to make reasonable but mis-

taken judgments by protecting all but the plainly incompe-tent or those who knowingly violate the law." *Id*. (quotation omitted).

Wessel and Lay contend that the intent requirement for a substantive due process claim was unsettled at the time of the restroom incident. They argue that a reasonable official could have believed at the time that the Eighth Amend-ment's "malicious and sadistic" excessive-force standard applied to a due process claim such as that asserted by Da-vis. *Cf. Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) ("[W]henever prison officials stand accused of using exces-sive physical force in violation of the [Eight Amendment's] Cruel and Unusual Punishments Clause, the core judicial inquiry is … whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadisti-cally to cause harm."). They assert that "[t]here was insuffi-cient evidence for a reasonable jury to infer that Wessel and Lay acted with the requisite subjective intent."

In making this determination, we must view the evidence in the light most favorable to Davis. *See Fox v. Hayes*, 600 F.3d 819, 832 (7th Cir. 2010). Viewing the evidence in that light, a reasonable jury could have found that Wessel and Lay knew that Davis could not effectively use the restroom while wearing the hand restraints; they refused to remove the hand restraints despite knowing that Davis was old, frail, and not a security risk while in the windowless re-stroom; and they laughed at Davis as he urinated on himself and then refused to allow him to clean himself. (Wessel and Lay challenged all of these points, but, as we have said, we are required to view the evidence in the light most favorable to Davis.) Taken together, these findings allowed the jury to

conclude that Wessel and Lay refused to remove Davis's hand restraints for the purpose of humiliating and causing psychological pain to Davis, and not for any legitimate security reason.

At the time of the incident at issue, it was clearly established that the Due Process Clause of the Fourteenth Amendment prohibited the unreasonable use of bodily restraints in a manner that serves to punish a civilly committed individual. *See Youngberg*, 457 U.S. at 321–22. Likewise, it was "clear that *Youngberg* applies to civil detainees who have committed criminal acts." *West v. Schwebke*, 333 F.3d 745, 749 (7th Cir. 2003). In *May*, we said that "[t]he use of bodily restraints constitutes punishment in the constitutional sense if their use is not rationally related to a legitimate non-punitive government purpose or they appear excessive in relation to the purpose they allegedly serve." 226 F.3d at 884 (citing *Bell*, 441 U.S. at 561); *see id*. (stating that, while around-the-clock "shackling [of] all hospital detainees reduces the risk of a breach of security and thus furthers a legitimate non-punitive government purpose," "[s]uch a policy is plainly excessive in the absence of any indication that the detainee poses some sort of security risk") (citing *Bell*, 441 U.S. at 539 n.20). In *May*, we denied qualified immunity, stating that we would not "characterize[e] the relevant constitutional right in a way that essentially demands precedent involving an almost identical factual scenario," and "[i]t is enough that precedent establishes that pretrial detainees may not be shackled without a good penological or medical reason." *Id*. The evidence viewed in the light most favorable to Davis demonstrates that Wessel and Lay violated the clearly established law governing substantive due process claims for excessive use of restraints.

Even under the Eighth Amendment standard advocated by Wessel and Lay, the evidence viewed in the light most favorable to Davis demonstrates that Wessel and Lay violated clearly established law by refusing to remove Davis's hand restraints for the purpose of humiliating and ridiculing Davis. *See Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (holding strip search "conducted in a harassing manner intended to humiliate and inflict psychological pain" states an Eighth Amendment claim); *see also Hudson v. Palmer*, 468 U.S. 517, 530 (1984) (indicating that the Eighth Amendment protects against "calculated harassment unrelated to prison needs").

Wessel and Lay take refuge behind the Facility directive that they maintain permitted them to remove restraints only "[w]ithin a secure facility in order to utilize the restroom." But there was conflicting testimony as to whether the corridor behind the courtroom was "secure." Moreover, the same directive allowed Wessel and Lay to call their supervisor for permission to remove the restraints, and a reasonable jury could find that they chose not to do so for the purpose of humiliating Davis. It must be remembered that Davis would have had no means of escape from the windowless restroom other than by force through Wessel and Lay (while Davis still wore leg shackles), and Wessel and Lay were each considerably larger, younger, and healthier than Davis. And finally, even if the directive meant what Wessel and Lay contend, "[a] jail cannot shield a cruel and unusual punishment from legal challenge simply by imposing it on everyone equally. That would serve only to magnify the constitutional problem." *King v. McCarty*, 781 F.3d 889, 898–99 (7th Cir. 2015).

The district court properly denied Wessel and Lay's motion for judgment as a matter of law.

### III.    CONCLUSION

The judgment is VACATED and the case is REMANDED for further proceedings consistent with this opinion.